NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 4, 2025

S24A0910. HARRIS v. THE STATE.

PINSON, Justice.

On September 14, 2021, Emmanuel Harris and his girlfriend, Jordan Gooch, got in a fight, and Harris stabbed and killed Gooch. Harris claimed that he stabbed Gooch in self-defense after she "came at" him with a knife. After a trial, he was convicted of malice murder.[1]

---

[1] Gooch died on September 14, 2021. On October 6, 2021, a Hall County grand jury returned an indictment that charged Harris with malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and possession of a knife during the commission of a felony (Count 4). After a jury trial from November 10-18, 2022, he was found guilty of all counts. On December 9, 2022, the trial court sentenced Harris to life with the possibility of parole for the malice murder (Count 1) and a consecutive five years to serve in prison for possession of a knife during the commission of a felony (Count 4). The trial court merged the aggravated assault and vacated the felony murder. It also ordered that the sentence was to run consecutive to a sentence imposed in a separate criminal case.

Harris timely filed a motion for new trial on January 4, 2023, which was

On appeal, Harris contends that the trial court abused its discretion by admitting evidence about his aggravated battery of his then-girlfriend, C.A., in 2017. The trial court admitted this evidence, which included detailed testimony from C.A. and many graphic photos of her injuries, as relevant to Harris's "motive" to "control" his partners with violence, as well as to show that he did not stab Gooch by accident or mistake.

We agree that admitting this evidence was an abuse of discretion. Rule 404 (b) of our Evidence Code limits the purposes for which evidence of "other crimes, wrongs, or acts" may be admitted: it may be used as proof of an issue in the case like motive or intent, but it may not be used merely to show that a person has bad character.[2]

---

amended on June 8, 2023. After a hearing on June 9, 2023, the trial court denied the motion for new trial on September 19, 2023. Harris timely filed his notice of appeal on October 18, 2023. The appeal was docketed to the August 2024 term of this Court and orally argued on August 20, 2024.

[2] OCGA § 24-4-404 (b) provides, in relevant part that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

That latter use is generally improper because jurors may place too much weight on a defendant's general bad character as evidence of his guilt instead of requiring the State to prove beyond a reasonable doubt the specific charge against him. And we have said before that such improper arguments based on a person's character are often smuggled into the case through too-generic theories of "motive": a motive to "obtain money and sex," or to "control other people with violence," is often just another way of saying that the defendant committed the charged crime because "that's who he is" or "that's what he does." See, e.g., *Strong v. State*, 309 Ga. 295, 312 (2) (d) (2) (845 SE2d 653) (2020); *Kirby v. State*, 304 Ga. 472, 487 (4) (b) (819 SE2d 468) (2018). That is exactly what happened here, where the State's generic "motive" lacked any logical connection to the evidence of Harris's past battery or the record in this case, and the State actually argued in closing that Harris "controlled" Gooch with "violence" because "that's what he does." And to the extent accident or mistake were at issue in this case, the minimal probative value of the other-acts evidence as evidence that Harris did not kill Gooch by accident

3

or mistake was far outweighed by unfair prejudice given its power as improper propensity evidence. So it was an abuse of discretion to admit the other-acts evidence in this case.

This error requires reversal of Harris's convictions because the State has failed to prove that the error was harmless. An error that does not violate the defendant's constitutional rights is harmless if it is "highly probable that the error did not contribute to the verdict." *Harris v. State*, 314 Ga. 238, 283 (5) (875 SE2d 659) (2022) (cleaned up). The other-acts evidence that was admitted in error was powerful and highly prejudicial: it allowed the State to cast Harris as a violent, repeat abuser using firsthand, graphic evidence, and the State asked the jury to rely on the impermissible inference from that evidence that Harris murdered Gooch because he was a bad person who had committed domestic violence before. The properly admitted evidence, although significant, does not dispel the likelihood that the prejudicial other-acts evidence contributed to the jury's guilty verdict, which necessarily rejected Harris's claim of self-defense.

For these reasons and others set forth below, Harris's convictions are reversed. Because the evidence was sufficient to authorize Harris's convictions, he may be retried if the State so chooses.

1. *Background*

The evidence at trial showed the following.[3]

(a) Harris and Gooch had been dating on-and-off for about a year, and living together for three or four months, at the time of Gooch's death. They had known each other for even longer and had dated for two or three years in the past. Gooch's sister, who sometimes spent the night at the apartment that Gooch shared with Harris, said that Gooch and Harris would sometimes "get in each other's faces" when they argued, but she was not aware of any physical violence in the relationship. Gooch's mother, who knew Harris "very well" because he had lived with the family for several months in the early years of the relationship, said that Harris "had a problem with

---

[3] When we assess whether an error was harmless, as we do below, we view the evidence as reasonable jurors would have viewed it rather than in the light most favorable to the jury's verdict. See *Ford v. State*, 319 Ga. 215, 215 n.2 (903 SE2d 1) (2024). So we recount the evidence here from that viewpoint.

5

his temper" but had told her when he and Gooch resumed their relationship that he had "sought help for his temper." There is no evidence in the record that Harris was ever violent toward Gooch before the day he stabbed her. But Harris testified that in February 2021, seven months before Gooch's death, he and Gooch had gotten into an argument at the airport, and Gooch had punched him in the face. Gooch's sister testified that she was aware of this incident.

The day before she was killed, Gooch stayed at her mother's home after an argument with Harris. While Gooch was with her sister, Harris called Gooch 32 times. Gooch eventually answered one of Harris's calls and then told her sister that Harris was coming over. Gooch went outside and talked to Harris when he arrived, and Gooch's sister watched them from a distance. Gooch's sister saw Gooch and Harris stand by Harris's parked car and talk for 30 or 40 minutes. Neither of them appeared "aggressive" and there was no physical contact, yelling, or screaming. After the conversation between Gooch and Harris ended, Harris left, and Gooch went back inside her mother's home, where she spent the night. Gooch told her

6

sister that Harris had apologized and said he would come to Gooch's "mom's house every day to check on her, and . . . apologize until she forgave him."

The next morning, Gooch told her mother and sister she was going to the apartment she shared with Harris to get a change of clothes. Late that night, Gooch's mother and sister learned that Harris had crashed Gooch's car and was in the hospital. But Gooch had not been in the car with Harris when he crashed, and Gooch's mother and sister could not get in touch with her. They were able to get into Gooch's and Harris's apartment the next day, where they found Gooch's dead body lying on the living room floor.

Investigators arrived soon after. They found a broken knife on the couch near Gooch's body and saw a large amount of blood on the knife and on the couch and carpet in the living room. The State's crime-scene expert opined that the blood spatter on the wall suggested Gooch had been stabbed while she was on the couch, and the pooling of blood on the floor was consistent with Gooch bleeding while on the floor. And this evidence could be consistent with Gooch

7

being stabbed either while on the ground or while sitting on the couch.

Harris's fingerprints were found on the knife along with a second set of fingerprints that could not be identified. The State's fingerprint examination expert explained that the unidentified fingerprint appeared to be a "fingertip impression" and it was "possible that the area [the examiner] needed to see for that comparison was not represented on" the known prints from Harris and Gooch because of the techniques used to collect them. The investigators also connected bloody footprints seen throughout the apartment to dried blood on Harris's feet, and the blood samples collected from the knife and Harris's feet matched Gooch's DNA.

A GBI medical examiner performed Gooch's autopsy and determined that Gooch died from multiple stab wounds. The medical examiner opined that the stab wound to the left side of Gooch's upper chest, near the shoulder and armpit region, had been fatal. This wound passed through Gooch's ribs, lungs, and heart. Gooch also had two stab wounds on the left side of her back, one close to her

shoulder and the other "lower down toward the midback"; two superficial cuts on the back of her left arm near the shoulder; and a cut on the back and side of her left wrist that was consistent with a defensive injury due to its location. Gooch also had two scalp hemorrhages on the right side of the head, which could be consistent with impact, such as being struck. The crime-scene expert opined that, if Gooch had been fighting back, she would expect to have seen wounds on both Gooch's and Harris's hands, but Harris only had minor scratches on his body.

A GBI agent interviewed Harris two days after Gooch's body was found, and a recording of that interview was played for the jury. During the interview, Harris said Gooch was mad that he was packing her things and he found her sitting on the couch with a knife by her side. He claimed self-defense, and said Gooch attacked him. He also said that, at some point, they "fell while fighting" over the knife, and Gooch was "cut," and he used a sweater to try to stop the bleeding. Later, he said that they were both holding onto the knife when they "tripped," and he fell on top of Gooch; he could not recall where

the knife went into Gooch's body. He also said he was trying to disarm Gooch, and he stabbed her to protect himself.

(b) Before trial, the State filed a notice of intent to introduce evidence under OCGA § 24-4-404 (b) of Harris's plea of guilty to the aggravated battery of his ex-girlfriend, C.A., in September 2017. The State contended that C.A's testimony was relevant to prove that Harris's "motive in killing [Gooch] was to control her with violence," and this was the same motive shown in the 2017 incident with C.A. The State proffered that the evidence would also rebut Harris's statement to police, during which he said that Gooch was stabbed when he tried to disarm her, claimed self-defense, and, according to the State, "said basically she had fallen on the knife." Harris objected to this evidence and argued that the State's alleged motive was too broad. The trial court ruled that this evidence was admissible under Rule 404 (b) to prove motive and absence of mistake or accident.

At trial, the court gave a limiting instruction before C.A.'s testimony, directing the jury to consider the evidence only as it related

to the issues of motive and absence of mistake or accident.

C.A. testified as follows. She and Harris had been dating and living together for almost a year when the battery happened, and Harris had never been violent toward her before then. Then one day he grew angry with her, raised his voice, and slapped her across the face. He apologized afterwards and promised "he would never hurt [her] again." But the next night, Harris became upset while they were playing a computer game, "slammed [C.A's] laptop shut," and told her "something to the effect of[,] 'You're being a little ridiculous.'" They both stood, and Harris screamed and spit in C.A.'s face, then pushed her to the floor and kicked her "over and over again on [her] backside." At one point he screamed, "Die!" C.A. testified that Harris was like "a different person" and had "pure hate in his eyes for [her]." Harris then ripped off C.A.'s nightgown and underwear and continued to kick her as she lay naked on the floor.

After this attack, Harris started packing his belongings and taking them to his car. He then came back to the room, pushed C.A. to the floor, and started kicking and pushing her again. At some

11

point, C.A. went downstairs and Harris "grabbed [her] head and threw [her] to the ground," and he kicked and punched her backside. This continued "for a very long time." Later, C.A. searched for her phone and discovered that Harris had it in his pocket; he refused to give it to her at first but did so after she promised not to call anyone or tell them what he had done. After that, Harris continued to move his belongings from their home to his car.

When C.A. thought Harris was gone, she locked herself in the bedroom, but he returned and broke through the locked bedroom door. She also hid in the bathroom with her dog at one point and he broke the door down.

After Harris left, C.A. looked in the mirror and saw that she had black bruises on her buttocks, broken nails, and injuries to her arms. The State introduced photographs that showed C.A.'s injuries, including a black eye, bruising with a handprint visible on her back, and two photos showing dark bruising across three quarters of her buttocks. After this incident, C.A. missed a week-and-a-half of work due to her injuries and was prescribed sleeping pills and anxiety

medication.

Harris later called C.A., apologized, and asked if he could return to their home but C.A. told him not to. In the days that followed, Harris sent C.A. "[a] lot of text messages." Screenshots of the text messages were introduced into evidence, and C.A.'s verbatim reading of these messages spans nearly 19 pages of the trial transcript. In the messages, he apologized, asked to come back, offered to pay C.A. money, professed his love for her, and asked for forgiveness. In the final text message that was read to the jury, Harris said he went to a doctor and had "a slipped disk from where you shoved me down the stairs because you were upset I was about to leave."

After C.A. finished testifying and was excused, the parties read a stipulation that Harris entered a guilty plea to two counts of aggravated battery of C.A. Harris testified that he served 22 months in jail with work release, meaning he was either at work or in jail during that period.

(c) Harris testified as follows. When asked about the weekend C.A. described in her testimony, Harris said he and C.A. "got into an

13

argument" that "escalated from . . . yelling, screaming, to . . . her grabbing me. I slapped her that night." The next night, Harris decided to leave, packed his belongings, and was taking them to his car when C.A. attacked him and pushed him down the stairs. Harris "got mad," went back upstairs, and "grabbed" C.A.; she then "grabbed him" and he "pushed her down. And then [he] kicked her several times on her backside." Harris testified that he was "ashamed" of his actions that night, pleaded guilty to charges related to that incident, and served a two-year sentence.

As to his relationship with Gooch, he testified that they had dated for almost three years in the past, broken up, and later resumed their relationship; she stayed at his apartment most nights and kept her belongings there. But Gooch would sometimes stay with her mother or a friend "for a couple days" when she and Harris had a "dispute." In July 2021, Harris and Gooch "had a big blowout" and he "kicked her out and moved all her stuff out." But they reconciled after "two or so weeks give or take a couple days," and Gooch moved back in.

Two nights before Gooch's death, Harris and Gooch got into an argument after Harris "made a snide remark." Gooch broke a plate during that argument, and Harris broke a lamp. They got into another argument the next morning, after Harris complained that he "wished [Gooch] would clean up more." Gooch "got into [Harris's] face," Harris asked her to leave, and she left. Later that day, Harris could not find his car keys and suspected Gooch took them when she left because she had previously taken his keys, phone, or wallet when she got mad at him. Harris called Gooch more than 20 times before she answered, and then he met her outside her mother's home. According to Harris, they discussed their relationship and Gooch did not want to end things, but Harris did, so he told Gooch they could arrange a future time for her to pick up her belongings from their apartment. Harris then returned home.

The next day, Gooch returned to the apartment and let herself in with her key while Harris was on a Zoom call. When Harris finished his call, he found Gooch sitting on the couch and she seemed "pissed off." She wanted to talk, but Harris went to the bedroom and

started packing Gooch's belongings. Gooch was "physically trying to stop" Harris and yelling at him. Eventually, she left the room and Harris continued to pack Gooch's belongings.

When Harris left the bedroom to go to the kitchen, he saw Gooch "standing there" with "a big silver kitchen knife in her hand." She had a "glare in her eye" and was holding the knife in her right hand. Gooch then "came at" Harris with the knife. Harris "caught her hand, her knife hand, and [he] kind of staggered back because it was dangerously close to hitting [him]." He was "scared" and in "survival mode," and he "manipulated" the knife in her hand and drove it into her shoulder. Gooch fell towards Harris, and he stabbed her again in the shoulder and they both fell. Harris testified that he stabbed Gooch "multiple times. It was a reaction, a survival instinct."

When asked why he did not take the knife from Gooch and toss it, Harris testified that she "came at" him fast and "with enough force" that he "lost control or full control trying to disarm her" and "reacted" because he "felt like [he] was about to die." After stabbing

Gooch, he "immediately panicked" and tried to stop the bleeding. Harris did not call 911 because Gooch "died quickly," he "panicked," and he was worried about the "optics" in part because he was "on probation." He then "popped some Klonopins" after he realized Gooch was dead and "blacked out."[4] So he did not remember what he did with the knife or what happened next, including leaving in Gooch's car and crashing it.

(d) The prosecutor argued in closing that Harris's "motive is to control romantic partners with violence. That's what he does. That's what he did in this case." The prosecutor argued that this motive was shown by the evidence that Harris "ripped off [C.A.'s] nightgown and left that handprint on her back and did this to her as she was lying in a fetal position on the ground and he is kicking her like a dog over and over" and his "incessant calls and text messages to C.A. and Gooch." The prosecutor also noted that Harris told both C.A. and Gooch that he was not going to give up on their relationship and

---

[4] Investigators found a prescription in Harris's name for clonazepam, the generic drug name for Klonopin, in the apartment.

he "doesn't take no for an answer."

The prosecutor argued that it was not a case of self-defense, "[a]nd if it's not self-defense, then it's murder. Since it's not self-defense, it has to be murder." Turning back to the State's motive theory, the prosecutor said, "You know from the evidence you heard that leaving — one of the partners leaving is not only generally a dangerous time, but it's a very dangerous time with Mr. Harris. You heard [C.A.] say that she sustained those injuries when he's leaving, when he's no longer in control." Then, as to Gooch, the prosecutor argued that "[w]hen Harris could not control [Gooch] with the incessant texts and apologies and the things he always tries, he ambushed [Gooch] and he exerted the ultimate and final control, the ultimate and final control. Twice in the back, twice in the back, and once through the heart and lungs." And, referring to broken clothes hangers found at the crime scene, the prosecutor argued "this explosive, violent behavior is how he kept [Gooch] off balance and controlled her."

(e) With respect to the Rule 404 (b) evidence, the trial court

instructed the jury that "the State may show motive and absence of mistake or accident" and has "offered evidence of another crime allegedly committed by the accused" to do so. The jury was instructed that this evidence could only be considered "insofar as it may relate to those issues and not for any other purpose" and should "not infer from such evidence that the defendant is of a character that would commit such crimes." If the jury found that Harris had committed these other acts, it "must then determine whether the acts shed any light on the issues for which the acts were admitted in the crimes charged in the indictment in this trial. Remember to keep in mind the limited use and the prohibited use of this evidence about other acts of the defendant." The court also instructed the jury on the defense of justification. The jury was not instructed on what must be shown to establish the defenses of accident or mistake.

2. *Analysis*

(a) *Rule 404 (b) Error*

Harris contends that the trial court erred by not excluding un-

der OCGA § 24-4-404 (b) (Rule 404 (b)) evidence about his aggravated battery of his ex-girlfriend in 2017. We review that ruling for an abuse of discretion. See *Harris*, 314 Ga. at 264 (3) (a).

If evidence has "any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence," it is relevant. OCGA § 24-4-401. And relevant evidence is admissible at trial unless it is "limited by constitutional requirements," or applicable "law or other rules" provide otherwise. Id. § 24-4-402.

Rule 404 (b) is one such law that requires the exclusion of potentially relevant evidence. That rule limits the admission of "[e]vidence of other crimes, wrongs, or acts," which is sometimes called "extrinsic" or "other-acts" evidence. *Roberts v. State*, 315 Ga. 229, 235 (2) (a) (880 SE2d 501) (2022). Evidence of a defendant's past wrongdoing is treated with caution because of the danger that the jury will view it as evidence of general bad character, and then convict the defendant because that bad character makes it more likely that he committed a crime — instead of determining whether the

20

evidence proves beyond a reasonable doubt that he is guilty of the charged offense. See *Michelson v. United States*, 335 U.S. 469, 475-476 (69 SCt 213, 93 LEd 168) (1948) ("[Evidence of the defendant's bad character to establish a probability of his guilt] is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." (footnote omitted)).[5] Evidence used in that impermissible way is commonly called "propensity evidence" because it relies on the theory that the defendant has a natural inclination or inherent tendency to behave in a certain (bad) way. See *White v. State*, 319 Ga. 367, 398-399 (903 SE2d 891) (2024) (Peterson, P.J., concurring) ("[W]hen a jury is informed that the criminal defendant in front of them did other bad things, jurors (like

---

[5] We often look to precedent from federal appellate courts interpreting the pertinent federal rule for guidance in applying our state rules of evidence when the corresponding federal rule is materially the same as ours because Georgia's Evidence Code is based on the Federal Rules of Evidence. See *Harris*, 314 Ga. at 264 (3) (a).

all human beings) are naturally more inclined to think the defend-

ant did the separate bad thing at issue in the prosecution. We often

call this inference 'propensity,' and label the State's effort to intro-

duce evidence for propensity 'improper' and 'impermissible.'"). To

guard against this improper use of other-acts evidence, our Evidence

Code says that such evidence may not be admitted "to prove the

character of a person in order to show action in conformity there-

with." OCGA § 24-4-404 (b).[6] On the other hand, other-acts evidence

---

[6] The dissent suggests that introducing evidence for the purpose of proving that the defendant acted in conformity with his character is entirely acceptable as long as it is also relevant for some other purpose. But that is not what the statute says: Although Rule 404 (b) says that other-acts evidence may be admissible for "other purposes," its first sentence makes clear that such evidence "shall not be admissible" to prove a person's character to show "action in conformity therewith," full stop. This is why courts must determine, as we do here, whether the evidence in question was actually relevant to another purpose, or just a cover for smuggling in propensity evidence. See, e.g., *Pritchett*, 314 Ga. at 778 (2) (b); *Harris*, 314 Ga. at 271 (3) (e); *Strong*, 309 Ga. at 312 & n.19 (2) (d) (2); *Kirby*, 304 Ga. at 486-487 (4) (b); *Brooks v. State*, 298 Ga. 722, 726-727 (2) (783 SE2d 895) (2016). And it is why courts give limiting instructions even when other-acts evidence is admitted for other purposes that tell the jury that it may not "infer from such evidence that the accused is of a character that would commit such crimes." *Nundra v. State*, 316 Ga. 1, 8 (2) (885 SE2d 790) (2023). In support of the contrary reading, the dissent relies on a handful of our past decisions. See *State v. Williams*, 316 Ga. 249, 253 (887 SE2d 285) (2023); *Lowe v. State*, 314 Ga. 788, 793 (2) (a) (879 SE2d 492) (2022); *Mattei v. State*, 307 Ga. 300, 303 (2) (835 SE2d 623) (2019). But none of these decisions go so far as to hold that other-acts evidence is admissible to prove

22

is admissible for "other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. And we have made clear that such evidence is offered "for other purposes," and thus not inadmissible under Rule 404 (b), if the State can show that it is relevant to an issue in the case other than the defendant's character. *Hood v. State*, 309 Ga. 493, 499 (2) (847 SE2d 172) (2020).

If other-acts evidence is relevant to an issue in the case other than the defendant's character, it is not inadmissible under Rule 404 (b). But it would still be subject to exclusion under OCGA § 24-4-403 (Rule 403) "if its probative value is substantially outweighed by the danger of unfair prejudice." Analysis of that question under Rule 403 is done in tandem with the analysis of relevance for a non-character issue required for Rule 404 (b), as part of a three-part test governing the admission of other-acts evidence. Under that test, (1) the evi-

---

propensity, because none of them describe the evidence that was admitted as even partly propensity evidence.

23

dence must be relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence must not be substantially outweighed by the danger of undue prejudice; and (3) there must be sufficient evidence that the defendant committed the acts at issue. See *Kirby*, 304 Ga. at 479 (4).

Here, the State argued and the trial court agreed that the evidence of Harris's aggravated battery in 2017 was relevant to explain Harris's motive for killing Gooch and to show that stabbing her was not an accident or mistake. We address each argument in turn.

(i) *Motive*

Speaking generally, motive is the defendant's "reason" for committing a crime. *Brooks v. State*, 298 Ga. 722, 726 (2) (783 SE2d 895) (2016). Motive is not an essential element of any crime, so the State need not prove it, but the State often wants to introduce evidence of motive because it can help prove that a defendant had the required criminal intent. See id. (describing motive as "the reason that nudges the will and prods the mind to indulge the criminal intent") (citation and punctuation omitted).

When the State seeks to use other-acts evidence to show motive, the danger that the evidence will be used as improper propensity evidence is acute. The problem is that motives are too easily described in "too generic a fashion." *Kirby*, 304 Ga. at 487 (4) (b). An alleged motive to "obtain money and sex," id., or to "control other people with violence," *Strong*, 309 Ga. at 312 (2) (d) (2) (punctuation omitted), for instance, can be just a "classic improper propensity argument" in disguise, because it focuses on an aspect of the defendant's bad character as the generic "motive" to act. Id. (citation and punctuation omitted). See also *Harris*, 314 Ga. at 270 (e).

To separate propensity arguments from motive arguments when the State seeks to use other-acts evidence to show motive, we require the alleged motive to have a "specific logical link to the alleged crimes." Id. (citing *Strong*, 309 Ga. at 312 (2) (d) (2)). Put another way, if the other-acts evidence actually tends to show the jury that the defendant had a specific reason for committing the charged crime, it is relevant to motive. If, on the other hand, the evidence

25

answers "why" a defendant committed the charged crime with "because that's what he does," it is more likely just propensity evidence in disguise. See, e.g., *Pritchett v. State*, 314 Ga. 767, 778 (2) (b) (879 SE2d 436) (2022) (argument that defendant "committed violent actions against those with whom he had a relationship to control them . . . . goes to propensity and is not a proper purpose to admit this [other-acts] evidence").

Applying these principles here, the State's argument that the other-acts evidence was relevant to show Harris's "motive" does not hold up. The State argued that Harris's battery of his ex-girlfriend in 2017 showed that he had a "motive to control intimate partners with violence." We have rejected this same generic motive as a "classic improper propensity argument" before. *Strong*, 309 Ga. at 312 (2) (d) (2). See also *Pritchett*, 314 Ga. at 778 (2) (b).[7] And nothing here

---

[7] The State and the dissent rely heavily (almost exclusively) on *Smart v. State*, 299 Ga. 414 (788 SE2d 442) (2016), where we concluded that the trial court did not abuse its discretion in admitting a past incident of domestic violence as evidence of a motive to control the victim with violence. Some of us have doubts about whether *Smart* was correctly decided. But in any event, our decisions after *Smart* have made clear that a generic motive to "control with

suggests that the argument is a proper motive argument this time around. None of the other-acts evidence the State offered has any apparent logical connection to a motive of "controlling with violence," either then or as to the charged crime. There was no evidence that Harris had been violent towards either woman (for "control" or otherwise) before the respective incidents that led to criminal charges, and the evidence about the battery in 2017 was instead that Harris had a "temper" and he "got mad" during an argument with his ex-girlfriend and battered her. Finally, were there any doubt that the other-acts evidence was not truly about motive, the State's closing argument would seem to dispel it: in describing the "motive" argument in closing, the prosecutor argued that Harris's "motive is

violence" is better understood as a propensity argument, thus cabining *Smart* to its unique facts, which included specific testimony about the manner in which the defendant used violence repeatedly against a past victim that "demonstrated that the violence was a mechanism for control of his intimate partners," and "very little evidence to show why [the] defendant 'lashed out at his wife.'" *Pritchett*, 314 Ga. at 778 (2) (b). See also *White v. State*, 305 Ga. 111, 122 (3) n.10 (823 SE2d 794) (2019) ("When a high court finds discordant opinions among its own horizontal precedents the court generally follows its decision in the most recent case, which must have tacitly overruled any truly inconsistent holding.") (cleaned up).

to control romantic partners with violence. *That's what he does. That's what he did in this case.*" In other words, the State told the jury that Harris had a natural tendency to behave in a particular way, and that is what he did to the victim here. That is a propensity argument, not a permissible basis for admitting the evidence of Harris's past battery. [8]

(ii) *Absence of Accident or Mistake*

The trial court also admitted the other-acts evidence as relevant to show the absence of accident or mistake. At trial, Harris testified that he acted in self-defense — not that the stabbing was an

---

[8] The dissent does no better than the State in this regard. Indeed, the dissent merely repeats the State's argument that the other-acts evidence shows Harris's "motive to control domestic partners with violence" and later notes that Harris's relationships with C.A. and Gooch "followed a very similar pattern." But like the State, the dissent fails to connect this argument with any specific evidence that tends to show that Harris stabbed and killed Gooch for a specific reason, as our precedent requires. See, e.g., *Strong*, 309 Ga. at 312 (2) (d) (2); *Kirby*, 304 Ga. at 487 (4) (b); *Thompson v. State*, 302 Ga. 533, 540 (III) (A) (807 SE2d 899) (2017). In short, like the State's motive arguments, the dissent's arguments that the other-acts evidence was relevant to prove motive reduce to propensity arguments: that Harris had a natural tendency to behave in a particular way, and that he probably acted in conformity with that tendency here.

accident or mistake — and the jury was instructed on what was required to prove the defense of justification but not on what was required to prove the defenses of accident or mistake. Nonetheless, the State contends that it was required to disprove accident or mistake even though Harris did not raise those defenses at trial because he said in his recorded police interview (which was played for the jury) that he and Gooch "fell" during the struggle over the knife, and she was stabbed when she "fell" or "tripped."

To be admissible under Rule 404 (b), evidence must be relevant to a non-character issue that is "in the case." *Hood*, 309 Ga. at 499 (2). See also OCGA § 24-4-401 (evidence is relevant if it has "any tendency to make the existence of any fact *that is of consequence to the determination of the action*" more probable or less probable than it would be without the evidence (emphasis added)). It is not clear that Harris's brief statement in his police interview that he stabbed Gooch when they "fell" or "tripped" put the defenses of accident or mistake at issue, particularly given that Harris affirmatively took them off the table at trial. Harris testified, and his counsel argued,

29

that he acted in self-defense — that is, *on purpose* to protect himself, not by accident or mistake — and so the jury was instructed on the defense of justification, but not on the defenses of accident or mistake. That makes this case different from the cases the State relies on, where the defendant's intent or the absence of mistake or accident were put at issue in some way and the defendant "made no affirmative steps to remove intent as an issue." *Naples v. State*, 308 Ga. 43, 51 (2) (e) (838 SE2d 780) (2020). Compare *Harrison v. State*, 310 Ga. 862, 867 (3) (855 SE2d 546) (2021) (other-acts evidence relevant to show intent where defendant "claimed the shooting was accidental") with *Parks v. State*, 300 Ga. 303, 306 (2) (794 SE2d 623) (2016) (other-acts evidence not relevant "to show appellant's knowledge and absence of mistake or accident as to the crimes charged" because "his knowledge was not at issue where the defense was justification, and he made no claim that he accidentally or mistakenly shot the victim" (emphasis omitted)).[9]

---

[9] We have left open the question whether the defense of accident or mistake must have been advanced for the State to introduce other-acts evidence

But even assuming mistake or accident were at issue and that the evidence that Harris battered C.A. was relevant to disproving those defenses, the evidence still had to be excluded if the probative value of that evidence was substantially outweighed by the danger of unfair prejudice.[10] The probative value of evidence is a function of its "logical force to prove a point and the need at trial for evidence on that point," and the need for such evidence "depends on the marginal worth of the evidence — how much it adds, in other words, to the other proof available to establish the fact for which it is offered." *Harris*, 314 Ga. 263 (3) (a) (cleaned up). And unfair prejudice results when relevant evidence "lure[s] the factfinder into declaring guilt on an improper basis rather than on proof specific to the offense charged." Id.

---

relevant to disproving such a defense. See *Thompson*, 302 Ga. at 541 (III) (A) ("Setting aside whether a defense of mistake or accident is a prerequisite to admission of evidence under Rule 404 (b) for [the purpose of proving lack of accident or mistake], the circumstances here do not support admission.").

[10] The parties do not dispute that there was sufficient evidence that Harris committed the battery of C.A. See *Kirby*, 304 Ga. at 479 (4).

The only conceivable theory that Harris's battery of C.A. several years before was relevant to proving that Harris did not stab Gooch by accident or mistake would be that his battery of C.A. on purpose made it less likely that he stabbed Gooch by accident or mistake. The logical force of that argument is quite weak, especially considering the length of time between the incidents and the significant differences between them. And because Harris's defense at trial was that he stabbed Harris on purpose in self-defense, not by accident or mistake, the State's need to disprove accident or mistake was quite low. By contrast, encouraging the jury to find that Harris stabbed Gooch on purpose because he had committed an act of violence against a girlfriend in the past invited the jury to use that evidence for an improper purpose: to find that Harris stabbed Gooch merely because he had "d[one] other bad things," *White*, 319 Ga. at 398-399 (Peterson, P.J., concurring). And the other-acts evidence put graphic images and details of the battery in front of the jury, including photos of C.A.'s nude back and buttocks covered in dark bruises. In other words, this evidence was just the sort of evidence

that Rule 403 is designed to protect against: a matter of "scant . . . probative force, dragged in by the heels for the sake of its prejudicial effect." *Harris*, 314 Ga. at 262-263 (3) (a).

*

Because the other-acts evidence the State put forward here was not relevant to prove motive and its minimal probative value as to the issues of accident or mistake was substantially outweighed by its unfair prejudicial effect, the trial court abused its discretion by admitting the evidence. See *Harris*, 314 Ga. at 262-263 (3) (a), 270 (3) (e); *Pritchett*, 314 Ga. at 778 (2) (b); *Strong*, 309 Ga. at 312 (d) (2)-(3).

(b) *Harmless Error*

Having concluded that it was an abuse of discretion to admit the evidence of Harris's battery of his ex-girlfriend in 2017, we must consider whether that error requires reversal of his convictions. Reversal is required unless the State proves that the error is harmless. See *Platt v. State*, 319 Ga. 1, 11 (3) (901 SE2d 114) (2024). An error

33

that does not violate the defendant's constitutional rights is harmless if it is "highly probable that the error did not contribute to the verdict." *Harris*, 314 Ga. at 283 (5) (cleaned up). To apply this standard, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done. Id. "Generally, we have found Rule 404 (b) errors harmless 'where the properly admitted evidence . . . was so strong that the prejudicial effect of the other-acts evidence had no significant influence on the guilty verdicts.'" *Nundra v. State*, 316 Ga. 1, 6 (2) (885 SE2d 790) (2023) (quoting *Heard v. State*, 309 Ga. 76, 91 (3) (g) (844 SE2d 791) (2020)).

When the error is admitting evidence that should not have been admitted, the harmless-error question turns on how much the wrongly admitted evidence likely mattered to the jury's decision to convict. See *Heard*, 309 Ga. at 91 (3) (g) (concluding that wrongly admitted other-acts evidence was harmful where it was the only evidence of the defendant's "involvement in violent acts," so the general principle that wrongly admitted evidence is harmless when it "had no significant influence on the guilty verdicts" did not apply).

34

See, e.g., *Pritchett,* 314 Ga. at 779 (2) (c) (wrongly admitted other-acts evidence had "little bearing" on the case and was harmless). That assessment is usually made by considering how powerful the wrongly admitted evidence was relative to the overall mix of evidence. If, for instance, the wrongly admitted evidence was "relatively benign" or "merely cumulative" of properly admitted evidence and the remaining evidence of the defendant's guilt was quite strong, the State may be able to prove that the error was harmless. *Harris*, 314 Ga. at 284 (5). See, e.g., *Hood v. State*, 299 Ga. 95, 105-106 (4) (786 SE2d 648) (2016) (wrongly admitted evidence of drug deals was harmless given "strong" evidence of defendant's guilt and other properly admitted evidence that he had distributed drugs to people other than the murder victim); *Kirby,* 304 Ga. at 487 (4) (c) (any prejudice caused by wrongly admitted other-acts evidence was "offset" by properly admitted evidence that the defendant had committed other violent crimes and "other compelling evidence" of his guilt). By contrast, if the wrongly admitted evidence was weighty —

35

perhaps because it carried a "high risk of prejudice" or was important to proving an element of the State's case — only the "most compelling properly admitted evidence of guilt" might prevent reversal. *Strong*, 309 Ga. at 317 (4). See, e.g., *Harris*, 314 Ga. at 288-289 (5) (wrongly admitted evidence only "weakly supported" the State's motive theory, and there was "substantial evidence both supporting and undermining" that the defendant intended to kill the victim); *Heard*, 309 Ga. at 91-92 (3) (g) (wrongly admitted evidence was "highly prejudicial and not at all cumulative" and properly admitted evidence of guilt "was not compelling" and largely circumstantial). The same can be said when the other-acts evidence so infects the trial that it affects the jury's perception of the defendant and its assessment of his credibility. Compare, e.g., *Strong*, 309 Ga. at 318 (4) ("[A]lthough the jury could have found Appellant guilty if it believed the State's witnesses and disbelieved Appellant, we cannot say that it is highly probable that the trial court's erroneous admission of the voluminous evidence that Appellant had previously committed multiple serious violent acts did not contribute to the

guilty verdicts that the jury returned."); *Baker v. State*, 318 Ga. 431, 451 (2) (d) n.20 (899 SE2d 139) (2024) (explaining that "[a]lthough the jury was authorized to disbelieve" the defendant's account, the prosecutor's "repeated use of the [wrongly admitted] video to emphasize [the defendant's] alleged propensity for gun violence would have significantly undermined his credibility with the jurors," and casting him as "a violent gunman" before it heard the defendant's own account "made it more likely that the jury would disbelieve" him "because he had been portrayed as the sort of person who would commit a crime like the one with which he was charged") with *Bowman v. State*, 319 Ga. 573, 584-585 (3) (905 SE2d 605) (2024) (assuming evidence that defendant used violence against his ex-wife was wrongly admitted and concluding that the assumed error was harmless because the "marginal harm" of the other-acts evidence "was unlikely to have significantly altered the jury's perception of [the defendant], given that the jury heard substantial other evidence, unchallenged on appeal, of [the defendant's] violence and jealousy against [the murder victim]"); *Rodrigues v. State*, 306 Ga. 867, 871-872 (2) (834

SE2d 59) (2019) (error in admitting other-acts evidence was harmless given that the "overwhelming evidence" undermined defendant's sole defense — that he stabbed the victim in self-defense — and the "marginal harm of learning [the defendant] was previously convicted of involuntary manslaughter related to a stabbing [was] unlikely to have substantially impacted the jury's perception of [the defendant], given that they were already aware that [the defendant] was incarcerated at the time of [the murder]," which took place at a prison).

The wrongly admitted evidence here was powerful and highly prejudicial. As we discussed above, evidence of a defendant's past bad acts is excluded precisely because jurors will give it too much weight, relying on the seductive logic that a defendant who does bad things probably did *this* bad thing, too. See *White*, 319 Ga. at 398-399 (Peterson, P.J., concurring); *Michelson*, 335 U.S. at 475-476. That is all the more likely when the specific content of the other-acts evidence is itself inflammatory, see *Strong*, 309 Ga. at 316-317 (4)

(considering "the severity of the prior acts and their resulting injuries" when assessing harm), or when the State relies on the wrongly admitted evidence in a significant way, see *Harris*, 314 Ga. at 283, 288-289 (5) (court erred by admitting a "substantial amount of evidence about Appellant's sexual activities" that "weakly supported" the State's motive theory); *Heard*, 309 Ga. at 91, 94 (3) (g) (wrongly admitted evidence was "shaky" and the only evidence of prior violence). Both things are true here. Harris's ex-girlfriend told the jury in explicit detail about his sudden and intense episode of domestic violence against her, which the State documented for the jury by introducing many graphic photos of the serious injuries he inflicted on her and having her read to the jury 19 transcript pages worth of text messages he sent after the incident. C.A. was also the last witness called by the State, so the jury heard her testimony immediately before hearing from Harris. And Harris spent the first portion of his testimony addressing the battery of C.A. rather than what he was on trial for – killing Gooch. This was also the only evidence that Harris had ever used violence against anyone before he stabbed

Gooch; without it, the evidence showed only that Harris had a "temper," that his relationship with Gooch was volatile emotionally, and that she once punched him during an argument. See *Heard*, 309 Ga. at 91-92 (3) (g) (concluding that wrongly admitted other-acts evidence was harmful in part because "there was no other evidence of [the defendant's] involvement in violent acts"). And the State not only relied on this evidence but leaned into the classic propensity argument throughout its closing, telling the jury that his battery of his ex-girlfriend showed that Harris's "motive is to control romantic partners with violence. *That's what he does. That's what he did in this case.*" See *Baker*, 318 Ga. at 448-449 (2) (d) (concluding that trial court's error in admitting 30-second rap video under OCGA § 24-4-403 was harmful in part because the prosecutor "emphasized during her closing argument that [the defendant] and other rap artists 'promoted' gun violence, because 'that's all they know,' a pointed argument that reinforced to the jury [the defendant's] alleged violent character") (alterations accepted). In sum, the other-acts evidence

here "added sharper, more damning, and more plainly criminal details to the State's portrayal of Appellant as a man of despicable character who deserved punishment." *Harris*, 314 Ga. at 284 (5).[11]

We cannot discount the effect that such powerful and prejudicial character evidence could have had on the jury's decision to find Harris guilty of murder. It is true that, apart from the other-acts evidence, the State also marshaled significant properly admitted evidence that tended to make Harris's claim of self-defense less likely. Gooch's autopsy showed that she died from a stab wound to her side but also had head wounds and two other stab wounds near her shoulder blade, only Harris's fingerprints were definitively identified on the knife, and Harris fled the scene. But Harris offered an explanation consistent with self-defense and the evidence for each point: He was "scared" and in "survival mode" when he "manipulated" the knife in Gooch's hand and drove it into her shoulder, and

---

[11] The dissent all but ignores the substantial unfair prejudice that results from inflammatory other-acts evidence framed and argued by the State as improper propensity evidence. But our precedent is clear that such evidence tips the scale heavily against a finding of harmless error. See, e.g., *Strong*, 309 Ga. at 316-318 (4); *Baker*, 318 Ga. 449-450 (2) (d); *Harris*, 314 Ga. at 284 (5).

then stabbed her again as they both fell. The crime scene expert's testimony that the blood spatter and other evidence could be consistent with Gooch being stabbed when she was on the couch or the floor matched his story that Gooch fell into him as they fought over the knife in her hand and then they both fell to the ground as he stabbed her. A second set of fingerprints were observed on the knife but not matched to anyone, which the examiner explained could be because it was a fingertip print and none of the known fingerprints from Harris or Gooch included such prints. And he left without calling 911 because he was worried how it would look considering his probation status, and then blacked out after taking Klonopin, an anti-anxiety medication for which he had a prescription. And the only other evidence of physical violence between the two was when Gooch punched Harris, an incident that was confirmed by Gooch's sister. So we cannot say that the State's theory of the case was so strong that it was highly probable that the improperly admitted and prejudicial evidence had no influence on the jury's verdict. Of course, Harris's account of self-defense depended on the jury believing him.

But the chance that the jury would credit his story was likely all but eliminated by the powerful and prejudicial evidence portraying Harris as a violent repeat abuser, wrongly admitted and introduced as part of the State's case against him before he ever took the stand. It is one thing for a jury to not believe a defendant because his story is not believable; it is quite another for a jury to not believe a defendant because he has already been shown to be a bad person who does bad things.[12] And any such inclination would have been driven home by the State's pure propensity argument in closing. See *Strong*, 309 Ga. at 318 (4). It is quite possible that the jury would have found Harris guilty even without the highly prejudicial evidence of Harris's past violence against his ex-girlfriend. But that was a decision for the jury to make based on properly admitted evidence, and we cannot

---

[12] This is why we must reject the dissent's assertion that "contradictions and gaps in Harris's testimony" compel a finding of harmless error. If the case for harmless error turns on Harris's credibility as the dissent claims, then the State cannot make that case, because we cannot rule out that the wrongly admitted other-acts evidence (and the propensity arguments that accompanied it) contributed to the jury's decision to not believe Harris. The standard for harmless error is not whether we think the jury likely would have convicted the defendant anyways, but whether the State has shown it is highly probable that the error did not contribute to the jury's decision. See *Platt*, 319 Ga. at 11 (3); *Harris*, 314 Ga. at 283, 287-289 (5).

rule out the likelihood that the jury instead reached that verdict based at least in part on the extensive, graphic, and highly prejudicial evidence of Harris's past violent acts. See *Rouzan v. State*, 308 Ga. 894, 901 (2) (843 SE2d 814) (2020). In short, the State has not proved that it is "highly probable" that this highly prejudicial evidence, admitted in error, did not contribute to the jury's verdict.

3. *Conclusion*

For the reasons set out above, the trial court abused its discretion by admitting the evidence of Harris's past battery in this case, and the State failed to prove that the error was harmless. Harris's convictions must therefore be reversed. The evidence of Harris's guilt was sufficient as a matter of constitutional due process, so the State may retry him if it so chooses. See *Harris*, 314 Ga. at 289 (6).

*Judgment reversed. All the Justices concur, except LaGrua, J., who dissents.*

44

LAGRUA, Justice, dissenting.

"Rule 404 (b) is a rule of inclusion[.]" *Henderson v. State*, 318 Ga. 752, 754 (1) (900 SE2d 596) (2024) (citation and punctuation omitted). The rule is designed to limit "the introduction of other acts evidence when it is offered for the *sole purpose* of showing a defendant's bad character or propensity to commit a crime." Id. at 754-755 (1) (citation and punctuation omitted; emphasis supplied). However, if relevant evidence is being offered to prove something *other* than criminal propensity—which may include one of the permissible reasons listed in the language of the rule—such evidence is presumptively admissible, subject to the balancing test set forth in Rule 403. See OCGA §§ 24-4-401 to 24-4-404 (b) (evidence may "be admissible for other purposes, including, *but not limited to*, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident") (emphasis supplied). Put differently, "Rule 404 (b) is an evidentiary rule of inclusion which contains a *non-exhaustive list* of purposes other than bad character for which other acts evidence is deemed relevant and

may be properly offered into evidence." *State v. Frost*, 297 Ga. 296, 300 (773 SE2d 700) (2015) (citation and punctuation omitted; emphasis supplied). The majority's opinion departs from this long-established precedent and continues the Court's trend of moving away from this principle of inclusion. Therefore, I must respectfully dissent.

1. As noted by the majority, evidence is relevant if it has "any tendency" to make the existence of "any" consequential fact "more probable or less probable than it would be without the evidence." OCGA § 24-4-401 ("Rule 401"). And "[a]ll" relevant evidence "shall be admissible" unless otherwise limited by law. OCGA § 24-4-402 ("Rule 402"). We have said that "[t]he standard for relevance is a liberal one, and relevant evidence is admissible *even if it has only slight probative value.*" *Carter v. State*, 317 Ga. 689, 693 (2) (895 SE2d 295) (2023) (citation and punctuation omitted; emphasis supplied). See also, e.g., *Siders v. State*, 320 Ga. 367, 374 (3) (a) (907 SE2d 645) (2024) ("The standard for relevant evidence is a liberal one, and such evidence is generally admissible even if it has only

slight probative value.") (cleaned up); *Wilson v. State*, 315 Ga. 728, 738 (8) (883 SE2d 802) (2023) (same, cleaned up). Although Rule 404 (b) disallows the admission of relevant evidence if it is offered to prove "the character of a person in order to show action in conformity therewith," such evidence is admissible if it proves, among other things, "motive" or "absence of mistake or accident," OCGA § 24-4-404 (b), which is exactly what the State used it for here.

At trial, the State presented the C.A. evidence to prove Harris's motive in killing Gooch: namely, his motive to use violence to control a domestic partner as the romantic relationship with that partner was ending. See *State v. Williams*, 316 Ga. 249, 253 (887 SE2d 285) (2023) ("Even evidence that reflects on a person's character or a trait of character . . . may be admitted under Rule 404 (b) . . . [as] proof of motive[.]") (cleaned up). Harris's motive in violently assaulting C.A. was relevant to his motive in his violent encounters with Gooch, i.e., to control domestic partners with violence as the relationship ends. Thus, the C.A. evidence was relevant even though it "incidentally place[d] [Harris's] character in issue." *Mattei v. State*, 307 Ga. 300,

47

303 (2) (835 SE2d 623) (2019) (cleaned up).

In *Smart*, a case the majority indicates may have been wrongly decided, we held that other-act evidence of spousal abuse was relevant and admissible if it "help[ed] the jury understand why [an a]ppellant might have used violence" against his wife. *Smart*, 299 Ga. at 418 (2) (a). And, while the majority distances itself from *Smart* by stating that "[s]ome of us have doubts about whether *Smart* was correctly decided," we have not cabined *Smart*. On the contrary, we have cited *Smart* explicitly referencing the holding so fundamentally important here. See *Lowe v. State*, 314 Ga. 788, 793 (2) (a) (879 SE2d 492) (2022) (citing *Smart* for its holding that, "evidence of prior acts of violence was relevant under Rule 404 (b) to help the jury understand that the defendant used violence to control the victim"); *Thompson v. State*, 308 Ga. 854, 858 (2) n.5 (843 SE2d 794) (2020) (noting *Smart*'s holding that prior domestic violence against the defendant's ex-wife "was relevant to the severe beating and strangulation death of his current wife because it demonstrated defendant's motive to control family members with violence and his

48

intent to harm his intimate partners") (cleaned up).

Thus, both in *Smart* and elsewhere, we have held that evidence of extrinsic domestic violence is admissible to prove motive in a domestic violence case under Rule 404 (b), and I believe it was likewise admissible here. See *Smart*, 299 Ga. at 418 (2) (a). See also *McWilliams v. State*, 304 Ga. 502, 510 (3) (820 SE2d 33) (2018) (holding that evidence of extrinsic acts of physical abuse of romantic partners "was needed to adequately explain that appellant became violent with his romantic partners after consuming alcohol, including inflicting blows to their heads").

Additionally, the State presented the C.A. evidence at trial to prove the absence of accident or mistake in the killing of Gooch. See OCGA § 24-4-404 (b). Although Harris did not argue those defenses to the jury, the State still had to prove beyond a reasonable doubt that Gooch's death was not an accident or mistake because Harris told the police that Gooch "fell on the knife." The trial court gave the jury a limiting instruction expressly permitting the jury to consider the C.A. act with respect to absence of accident or mistake.

Thus, "[a]lthough the defense did not expressly contend that [the charged murder] was an accident, the State bore a heavy burden to overcome this implication[.]" *Naples v. State*, 308 Ga. 43, 52 (2) (e) (838 SE2d 780) (2020).[13] Accordingly, I believe the C.A. evidence was also admissible under Rule 404 (b) to prove the absence of accident or mistake. See OCGA § 24-4-404 (b).

Moreover, in this case, the majority has underemphasized Rule 403's inclusive nature in considering the admissibility of the C.A. evidence. Rule 403 allows the admission of *unfairly* prejudicial evidence—it is *only* when the unfair prejudice "substantially" outweighs the probative value that Rule 403 mandates exclusion. See OCGA § 24-4-403. Again, "Rule 404 (b) is a rule of inclusion" and Rule 403 is merely an "*extraordinary* exception to that inclusivity." *West v. State*, 305 Ga. 467, 474 (2) (826 SE2d 64) (2019) (citation and punctuation omitted; emphasis supplied). See also *Baker v. State*,

---

[13] The majority correctly notes that *Thompson v. State*, 302 Ga. 533, 541 (III) (A) (807 SE2d 899) (2017), pretermits whether a defendant must raise the defense of accident or mistake before other-act evidence may be admitted addressing those issues. Because *Naples* issued after *Thompson*, *Naples* controls here.

318 Ga. 431, 442 (2) (a) (899 SE2d 139) (2024) (noting that "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly") (citation and punctuation omitted). As such, "in reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its admission, *maximizing* its probative value and *minimizing* its undue prejudicial impact." *Wilson v. State*, 312 Ga. 174, 190 (2) (860 SE2d 485) (2021) (cleaned up; emphasis supplied). See also *Morrell v. State*, 313 Ga. 247, 259 (2) (b) (869 SE2d 447) (2022) (holding that, pursuant to Rule 403, "courts must look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact") (cleaned up).

"The probative value of evidence is a combination of its logical force to prove a point and the need at trial for evidence on that point." *Harris*, 314 Ga. at 263 (3) (a) (citation and punctuation omitted). The prosecutorial need for the C.A. evidence to prove Harris's motive and the absence of accident or mistake in this case was very high. The only two theories of motive offered at trial were

the State's theory that Harris used violence as a means of controlling Gooch because he sought to control his domestic partners through violence whenever that relationship was ending, and Harris's counter-theory that Gooch attacked Harris with a deadly weapon because Harris was "kick[ing her] out of the apartment for the umpteenth time." Gooch obviously could not testify about what happened and why, and there were no other eyewitnesses except Harris. Just as in *Smart*, we have "very little evidence" explaining why Harris would have "lashed out" against Gooch (or why she would have attacked him, as Harris maintained). *Smart*, 299 Ga. at 419 (2) (b). Thus, this case is directly in line with our precedent which admits extrinsic evidence pursuant to Rule 403 in the face of high probative value. See *McWilliams*, 304 Ga. at 510 (3). See also *Harrison v. State*, 310 Ga. 862, 868 (3) (855 SE2d 546) (2021) (holding that evidence that the appellant "had a history of committing jealousy-fueled violent acts against a romantic partner" had "significant probative value in establishing that his conduct . . . was intentional and not accidental") (citation and punctation

omitted).

The danger of unfair prejudice from the admission of the C.A. evidence was limited and did not substantially outweigh its prejudicial effect. In *Smart*, supra, we admitted evidence of Smart's abuse of his previous spouse – that he would "often punch" his ex-wife, and that he "shoved her out of [a broken] window" when she was eight-months pregnant, such that she was "injured and bloody," and then, when she finally made it inside the house, he "forcefully dragged" her back out of it – because "there was nothing inherent in this evidence that would create a risk" that the jury convicted Smart on a ground "different from proof specific to the offense charged." *Smart*, 299 Ga. at 416, 419 (2) (cleaned up). Here, the C.A. evidence, including C.A.'s testimony and the photographs depicting C.A.'s bruising, though troubling, was not unduly "graphic." See *Flowers v. State*, 307 Ga. 618, 623 (2) (837 SE2d 824) (2020) (citing *Smart*, holding that the danger of unfair prejudice of testimony and video evidence of a previous "beating" did not substantially outweigh its probative value, because there was nothing "inherent" in the

53

evidence creating a risk that the appellant "would be convicted on a ground different from proof specific to the offense charged"). Moreover, Harris testified that he and Gooch "kind of went through [a violent] cycle over and over again" and continued to have "some turmoil, lots of ups and downs" in the weeks before Gooch's death, including the argument where Gooch broke a plate and Harris broke a lamp.

Harris's relationship with C.A. followed a very similar pattern, also resulting in a violent end.[14] As the State observed, both C.A. and Gooch were involved in arguments with Harris that lasted for several days, following which Harris packed his own belongings or his partner's belongings with the intention of ending the cohabitation and likely the relationship itself. Additionally, at some point during the respective arguments, Harris apologized profusely, and then, just as the relationship ended, violence ensued. Indeed,

---

[14] Extrinsic evidence offered to prove motive need not reflect "overall similarity" with the charged crime; the extrinsic evidence only needs to be "logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged." *Mattei*, 307 Ga. at 303 (2) (cleaned up).

the jury heard Harris describe himself as "abusive" three times to C.A. And, after the fact, Harris accused both women of having initiated the violence.

Thus, looking at the C.A. evidence "in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact," *Wilson*, 312 Ga. at 190 (2) (citation and punctuation omitted), the trial court did not clearly abuse its discretion in admitting the C.A. evidence.

2. It is also highly probable that any error in the admission of the C.A. evidence did not contribute to the verdict against Harris in this case. See *Smart*, 299 Ga. at 416-419 (2). Although the C.A. evidence was disturbing, it is highly unlikely that it caused the jury to convict "on a ground different from proof specific to the offense charged." Id. at 419 (2) (b) (citation and punctuation omitted).

Moreover, the State successfully impeached Harris's credibility on several points, including his claim of self-defense, making it highly probable that evidence of the C.A. incident did not contribute to the verdict. Harris admitted at trial that he lied when he told

investigators that he saw a knife next to Gooch on the couch; he contradicted his statement to investigators that Gooch "fell on the knife" by testifying that "she was stabbed before" she fell; and although he told investigators that "it was a full-on fight" that "lasted minutes," he testified that it happened "very, very fast," and lasted "[a] couple of seconds, maybe."

Additionally, Harris's trial testimony regarding what he did after Gooch's death was inconsistent; first stating that he drove away in Gooch's car after he killed Gooch, but he could not recall where he went; then admitting that he used a map program on his iPad for directions on where to go, but he could not recall his password to access the iPad. And the text messages between Harris and Gooch had been intentionally deleted from Harris's cell phone and were irretrievable, but all his other text messages remained.

The contradictions and gaps in Harris's testimony are glaring, and combined with the physical evidence, are compelling evidence of Harris's guilt. See *Daughtie v. State*, 297 Ga. 261, 263-264 (2) (773 SE2d 263) (2015) (noting that in combination with other evidence,

"a statement by a defendant, if disbelieved by the jury[,] may be considered as *substantive evidence* of the defendant's guilt") (citing *United States v. McCarrick*, 294 F3d 1286, 1293 (11th Cir. 2002) (emphasis in original)).

Notably, any undue prejudice arising from the C.A. evidence was minimized when Harris told the jury that he pleaded guilty to the aggravated battery of C.A. and spent two years in a work-release program. This admission "reduce[d] the risk that the jury convicted [Harris] to punish him for his other crime[]," because the jury heard that Harris "had already been punished for [that crime]." *Nundra v. State*, 316 Ga. 1, 7 (2) (885 SE2d 790) (2023).[15] The trial court's limiting instructions also mitigated any undue prejudice arising from the C.A. evidence because "we presume that the jury followed the instructions not to consider it for any other purpose." *Thomas v. State*, 314 Ga. 681, 688 (1) (c) (878 SE2d 493) (2022) (citation

---

[15] Harris further minimized the risk that the jury would convict him for his crime against C.A. when he testified that the C.A. attack was "[j]ust completely ugly and inexcusable," that he "messed up really bad" and was "ashamed . . . . completely ashamed," and that it was "one of the lowest points of [his] life."

omitted); *McWilliams*, 304 Ga. at 511 (3) ("Any prejudicial impact of the extrinsic acts evidence was mitigated when the trial court gave the jury specific instructions about the limited purpose of the evidence.") (citation omitted). And the State did not unduly emphasize the C.A. evidence at trial. The record reflects that 17 witnesses testified about what happened in this case, and while the majority correctly notes that C.A.'s verbatim reading of her text conversation with Harris spanned roughly 19 pages of trial testimony, that text exchange consisted mainly of Harris's apologies to C.A. and his begging for the chance to make things right. During the State's closing argument, the State referenced the C.A. evidence very briefly. The majority of the State's closing argument addressed Harris's credibility, the contradictions in his depiction of how the killing happened, his self-defense claim, and the physical evidence,[16] without any reference to the C.A. evidence.

---

[16] The State pointed out to the jury that evidence showed that Harris was 6'1" and 225 pounds, and he was admittedly an ex-marine with years of combat and martial arts training, specifically including with knives. Kennedy Gooch testified that Gooch was 5'8" and that Harris was "way stronger and bigger than her."

With respect to the State's reference to the C.A. evidence during closing argument, the State argued that Harris's motive for killing Gooch was "hard to understand," which was why the C.A. evidence was necessary to prove that Harris's "motive [wa]s to control romantic partners with violence" and to show that Gooch was in the most danger when she tried to leave, just like C.A. was.

In sum, Harris's contradictory testimony and the evidence presented against him at trial were compelling evidence of his guilt, and the evidence pertaining to the incident with C.A. was not inherently prejudicial, both because the jury heard that Harris pleaded guilty to the related aggravated battery charge and because the State did not unduly emphasize, or unfairly characterize, the C.A. evidence during trial or in closing. Thus, even if admission of the C.A. evidence was an abuse of discretion, it is "highly probable that the error did not contribute to the verdict." *Nundra*, 316 Ga. at 6 (2) (cleaned up).

As such, I dissent.