310 Ga. 862
FINAL COPY

S20A1104.  HARRISON v. THE STATE.

LAGRUA, Justice.

Kevin Harrison was tried by a Barrow County jury and convicted of murder and other crimes in connection with the shooting death of his wife, Heather Harrison. On appeal, Harrison contends that the State failed to carry its burden to disprove that the shooting was accidental and that the trial court erred in refusing to give a requested jury instruction and in admitting certain other acts evidence.[1]  Having identified no error, we affirm.

---

[1] The victim was killed on February 28, 2016. On May 3, 2016, a Barrow County grand jury indicted Harrison, charging him with malice murder, felony murder, aggravated assault (family violence), two counts of possession of a firearm during the commission of a felony, and simple battery (family violence). Harrison was tried before a jury in October 2017 and found guilty on all counts. The trial court sentenced Harrison to life in prison without the possibility of parole for the malice murder, a consecutive term of five years on one of the firearm possession counts, and a concurrent twelve-month term for simple battery. The other counts merged or were vacated by operation of law. Harrison filed a timely motion for new trial on November 6, 2017, and the trial court denied the motion in an order issued on June 27, 2019. Harrison timely appealed, and this case was docketed to the August 2020 term of this Court and thereafter submitted for a decision on the briefs.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed as follows. Just after midnight on February 28, 2016, Heather was shot in the head by Harrison in the master bathroom of the couple's Barrow County home. In the months leading up to the shooting, Heather had confided in multiple friends and family members that she was unhappy in her marriage; that Harrison was jealous, possessive, and controlling; and that she intended to move out of the couple's home and seek a divorce. During that time, Harrison, who was aware of Heather's intentions, contacted many of these same people to ask for advice on how to prevent Heather from leaving him. These witnesses described Harrison as being "broken-hearted" and "in a panic" about the prospect of Heather's leaving; one witness testified that Harrison would call or text him for advice up to 30 times a day. Another witness testified that Harrison believed Heather "was cheating on him with every guy" with whom she interacted, including her own brothers.

Several witnesses testified that, on February 27, Heather

2

planned to tell Harrison she was ending the relationship. Shortly before midnight, Heather communicated by phone and text with three of her close friends, reporting that she and Harrison were fighting because she had told him she was moving out and that Harrison had shoved her into a dresser and injured her back. One of these friends, Jennifer Bandy, testified that, after their initial conversation, in which Heather had said she was preparing to leave the house, Heather called her back, sounding scared, and asked Bandy to come get her because "Kevin is not going to let me leave." That call was placed at 12:02 a.m. Less than 20 minutes later, Bandy arrived to find the couple's house cordoned off by police tape and an ambulance leaving for the hospital, where Heather ultimately died.

First responders from the Barrow County Sheriff's Office were dispatched to the scene in response to a 911 call placed by Harrison at 12:08 a.m. According to these officers, they arrived to find Harrison calm and "nonchalant." Harrison directed the officers inside, where they found Heather on the floor of the master bathroom, bleeding from a gunshot wound to the head. On the bath

3

mat was a shell casing; in the bathroom wall was a single bullet hole; and on the dresser in the master bedroom was a holstered firearm with its hammer cocked. Investigators later found a packed overnight bag in the master bedroom.

Harrison told officers at the scene that he had accidentally shot Heather during an argument. He first stated that he had been "trying to take his gun off" after coming inside when the gun accidentally discharged, firing at an upward angle. He then gave a lengthier account, which was recorded, in which he claimed that the gun, which he was wearing in a holster on his hip, "popped" out when he walked into the door frame and, in his attempt to catch it, he accidentally pulled the trigger. At the request of investigators, Harrison attempted to reenact what had happened, but he was never able to make the gun fall out of the holster as he claimed it had, nor was he able to replicate his pulling of the trigger without first readjusting his grip on the gun. After being transported to the sheriff's office, Harrison gave another recorded interview, in which, after investigators told him that his story was not consistent with

the evidence, Harrison stated that he had been angry because he believed Heather had been unfaithful and that "pure evil" had come over him; that he had brandished the gun only to scare her, believing it was not loaded; and that he had pulled the trigger "as a reaction." In a recorded phone call with his mother from jail, Harrison repeated his claim that he did not believe the gun was loaded and had pointed the gun at Heather only to scare her.

A GBI firearms examiner testified that, based on his testing and examination, the gun with which Heather was shot was not defective and would not have discharged accidentally through mishandling or being dropped. The medical examiner testified that the fatal bullet had entered Heather's forehead and traveled through the back of her head at a slightly downward angle.

Several witnesses testified about domestic violence perpetrated by Harrison against Heather during their marriage, including one incident in which Harrison grabbed Heather by the throat, pushed her against a wall, and began choking her, and another in which Harrison, in a fit of rage, yanked the car steering

5

wheel while Heather was driving, causing their car to veer off the road. One of Heather's sisters testified that, when discussing her desire to divorce Harrison, Heather expressed concern about her ability to leave without her children being harmed "or getting hurt herself." Another of Heather's sisters testified that Heather had grown afraid of Harrison and had said she wanted another person with her when she ended their relationship. Heather's grandmother testified that Heather told her Harrison had threatened to kill her if she left him.

Harrison's cell phone records reflected a several-minutes-long phone call placed at 11:48 p.m. on February 27 from Harrison's phone to a recipient designated in Harrison's phone contacts as "Rigo," whom investigators ultimately identified as Rigoberto Salcido, a former co-worker of Harrison. Salcido testified that Harrison had called him late in the evening on February 27 to inquire about traveling to Mexico.

Finally, the State presented testimony from Harrison's ex-wife, Andrea Horne, about several incidents of domestic violence

6

committed by Harrison during their marriage and eventual separation in 2006 and 2007. In the first incident, after he became aggressive and Horne was about to retreat to her mother's home, Harrison angrily "slung" Horne into a dresser, so forcefully that the dresser broke through the wall. In a second incident, during their separation, Harrison called Horne and threatened that she was "going to die" if she did not come back home. In a third incident, during a custody exchange in a restaurant parking lot, Harrison emerged from his car in a rage, screamed at Horne about "screwing" other men, called her "trash" and a "whore," spat on her, hit her in the face with a backpack, and hit her multiple times in the stomach. In the fourth and final incident, Harrison appeared with a gun outside Horne's home, and, while speaking to her through a window with the gun pointed at her, Harrison told her "to come outside and play with him, that this [was] the day that [she] was going to die." Horne testified that Harrison was "jealous[ ] . . . because he [thought] I was having an affair."

1. Harrison contends that the trial court erred in denying his

7

motion for directed verdict because the State failed to satisfy its burden to disprove that Heather's shooting was accidental. We review the denial of a motion for directed verdict under the same standard as that under which we determine the sufficiency of the evidence. See *Moore v. State*, 306 Ga. 500, 502 (1) n.4 (831 SE2d 736) (2019). Here, the evidence authorized the jury to find a history of domestic violence by Harrison against Heather and a clear motive for Harrison, who was jealous and upset at the prospect of Heather's leaving him, to commit further violence against her. Harrison's credibility regarding the shooting was significantly undermined by his shifting accounts of the incident and his inability to successfully replicate the sequence of events that he claimed culminated in the gun's accidental discharge. Additionally, the testimony of the firearms examiner refuted Harrison's claim of an accidental discharge; likewise, the medical examiner's testimony undermined Harrison's claim that the gun had fired upward. Furthermore, the evidence of Harrison's prior acts against Horne substantiated the finding that the shooting of Heather was an intentional act

motivated by anger and jealousy. Finally, the evidence that Harrison called Salcido mere minutes before the shooting to ask about traveling to Mexico was highly probative of not only intent but also premeditation. Viewed in its totality, this evidence was sufficient to enable the jury, as the exclusive arbiter of evidentiary conflicts and witness credibility, see *Walker v. State*, 296 Ga. 161, 163 (1) (766 SE2d 28) (2014), to find that the shooting was intentional rather than accidental, and to conclude beyond a reasonable doubt that Harrison was guilty of all of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Hopwood v. State*, 307 Ga. 305, 305-306 (1) (835 SE2d 627) (2019) (evidence was sufficient to authorize jury to disbelieve defendant's claim that shooting was an accident).

2. Harrison next contends that the trial court erred in refusing to give his requested jury instruction explaining that felony murder is not a lesser included offense of malice murder. Harrison contends that the absence of such an instruction rendered the jury charge

9

confusing by failing to make clear that malice murder and felony murder are equally serious crimes that carry the same range of penalties.[2]

For a requested jury instruction to be warranted, it must be "legal, apt, and precisely adjusted to some principle involved in the case." *Barron v. State*, 297 Ga. 706, 708 (2) (777 SE2d 435) (2015) (citation and punctuation omitted). While it may be legally accurate to state that felony murder is not a lesser included offense of malice murder, see OCGA § 16-1-6, the court's instructions here did not in any way indicate otherwise. In any event, even to the extent the jury may have believed that felony murder was a lesser crime with a lesser punishment, the court clearly — and properly — instructed the jury that punishment was not to be considered in its deliberations. See *Bellamy v. State*, 272 Ga. 157, 159 (4) (527 SE2d 867) (2000) (it is improper to instruct jury on sentencing before it

---

[2] The transcript from the charge conference reflects that Harrison's counsel harbored concern, based on her experience from a previous case, that the jury might settle on felony murder as what it believed was a compromise verdict.

has determined guilt or innocence). Finally, given that the jury found Harrison guilty of both offenses and thus clearly did not render a compromise verdict, any possible error in failing to give the requested instruction was harmless. See *McClain v. State*, 303 Ga. 6, 9 (2) (810 SE2d 77) (2018) ("a jury-instruction error is harmless when it is highly probable that (the error) did not contribute to the verdict") (citation and punctuation omitted).

3. In his final enumeration, Harrison contends that the trial court erred in permitting the State to introduce evidence of Harrison's prior acts against Horne. Under OCGA § 24-4-404 (b) ("Rule 404 (b)"),

> [e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

In order to be admissible under Rule 404 (b), evidence of an accused's other acts must be (1) relevant to some issue other than character; (2) admissible under OCGA § 24-4-403, in that its probative value is

11

not substantially outweighed by the danger of unfair prejudice; and (3) sufficient to permit the jury to conclude by a preponderance of the evidence that the accused actually committed the other act. See *Olds v. State*, 299 Ga. 65, 69-70 (2) (786 SE2d 633) (2016). A trial court's decision to admit evidence under Rule 404 (b) will be disturbed only if it constitutes a clear abuse of discretion. See *Bradshaw v. State*, 296 Ga. 650, 656 (3) (769 SE2d 892) (2015).

Here, the trial court expressly admitted Horne's other acts testimony for the purpose of establishing Harrison's intent and motive as to the shooting. Because Harrison "entered a plea of not guilty, [he] made intent a material issue, and the State may prove intent by qualifying Rule 404 (b) evidence absent affirmative steps by the defendant to remove intent as an issue." *Hood v. State*, 309 Ga. 493, 499-500 (2) (847 SE2d 172) (2020) (citation and punctuation omitted). Moreover, because Harrison claimed the shooting was accidental, his intent was particularly salient in the case.

"[T]he relevance of other acts evidence . . . is established when the prior act was committed with the same state of mind as the

12

charged crime." *Naples v. State*, 308 Ga. 43, 51 (2) (838 SE2d 780) (2020). Here, Horne testified about acts constituting assault and battery. Because Harrison was charged with, among other things, aggravated assault and battery, the evidence of Harrison's previous acts of assault and battery was relevant to his intent to commit those crimes. See id. (where appellant was charged with felony murder predicated on first-degree child cruelty, his prior acts of child abuse were relevant to prove intent). And Harrison's commission of prior acts of intentional violence or threats thereof was relevant in showing that the shooting of Heather was done intentionally rather than by accident. The first prong of the Rule 404 (b) test has, thus, been satisfied.[3]

In evaluating the second prong, we examine both the probative value and the prejudicial effect of the other acts evidence. See *Olds*, 299 Ga. at 70. "Probative value . . . depends on the marginal worth

---

[3] Having concluded that this evidence was relevant to intent, and because Harrison does not challenge the trial court's jury instructions as to the admission of this evidence, we need not examine whether the evidence was also relevant to motive. See *Hood*, 309 Ga. at 500 n.8.

13

of the evidence — how much it adds, in other words, to the other proof available to establish the fact for which it is offered." Id. at 75-76 (2). In assessing the probative value of other acts evidence in proving intent, we consider the acts' overall similarity to the charged crimes, their temporal remoteness, and the prosecutorial need for it. *Hood*, 309 Ga. at 501.

Here, Harrison admits that the prior acts were similar to the charged crimes, as both sets of acts involved threats and violence against a romantic partner — including the shoving of the victim into a dresser and the use of a gun — apparently motivated by jealousy and anger. While the prior acts occurred some nine to ten years earlier and were thus somewhat remote in time from the charged crimes, the prosecutorial need for the evidence was high. See *McKinney v. State,* 307 Ga. 129, 137-138 (3) (834 SE2d 741) (2019) (other acts evidence properly admitted despite 15-year lapse between prior acts and charged crimes where prosecutorial need was high). Harrison claimed the shooting was an accident, and there was no direct evidence, aside from Harrison's own account, of how

the shooting transpired. Evidence that Harrison had a history of committing jealousy-fueled violent acts against a romantic partner thus had significant probative value in establishing that his conduct here was intentional and not accidental. See *McWilliams v. State*, 304 Ga. 502, 510-511 (3) (820 SE2d 33) (2018) (affirming admission of evidence of appellant's past abusive conduct against a romantic partner where appellant claimed victim's death was accidental). While it is true that there was also forensic evidence undercutting Harrison's claim that the shooting was accidental and evidence that Harrison was upset at, and had made threats because of, Heather's intent to end their relationship, this evidence did not render the other acts testimony unnecessary to the State in shouldering the burden to prove Harrison's intent and disprove his accident defense.

With regard to prejudice, we note that "it is only when *unfair* prejudice substantially outweighs probative value that [Rule 404 (b)] permits exclusion." *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017) (citation and punctuation omitted; emphasis in original). Given the high probative value of the evidence

15

in proving Harrison's intent and rebutting his claim that the shooting was accidental, we discern no abuse of discretion in the trial court's ruling that the prejudice inherent in the other acts evidence did not substantially outweigh its probative value. See *McKinney*, 307 Ga. at 138 (no abuse of discretion in trial court's conclusion that prejudice did not substantially outweigh the significant probative value of appellant's prior assault). This is particularly true given that the trial court instructed the jury, both prior to Horne's testimony and at the close of the evidence, that this evidence was to be considered only for the limited purposes for which it was admitted. See id. (prejudicial effect of other acts evidence was mitigated by court's limiting instructions); *McWilliams*, 304 Ga. at 511 (same).

Finally, as to the third prong of the Rule 404 (b) test, there is little doubt that Horne's testimony sufficed to establish by a preponderance of the evidence that Harrison did in fact commit the acts about which Horne testified. Accordingly, we conclude that there was no clear abuse of discretion in the trial court's admission

of the other acts evidence. This enumeration, like those addressed above, affords no basis for relief, and we therefore affirm.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 1, 2021.
Murder. Barrow Superior Court. Before Judge Primm.
*Kathleen J. Anderson*, for appellant.
*James B. Smith, District Attorney, Patricia J. Brooks, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.