In the Supreme Court of Georgia

Decided: August 26, 2025

S25A0731.  HALL v. THE STATE.

MCMILLIAN, Justice.

Michelle Garner Hall was convicted of felony murder for the

shooting death of her husband John Britt Hall ("Britt").[1] On appeal,

---

[1] The shooting occurred on July 30, 2008. On January 5, 2009, a Coweta County grand jury indicted Hall, charging her with malice murder (Count 1), felony murder (Count 2), and aggravated assault – family violence (Count 3). At a trial from September 21 through 25, 2009, a jury found Hall guilty on all counts. After a direct appeal, this Court affirmed her convictions. See *Hall v. State*, 287 Ga. 755 (2010).

This case appeared again before this Court from a trial court's grant of habeas relief, which this Court reversed. See *Seabolt v. Hall*, 292 Ga. 311 (2013). Hall then pursued a habeas petition in federal court, which was denied by the district court in June 2014. The United States Court of Appeals for the Eleventh Circuit reversed based on the ineffective assistance of appellate counsel and remanded the case to the district court with direction to grant Hall a "new direct appeal." *Hall v. Warden*, 686 FApp'x 671 (11th Cir. 2017). The district court entered an order adopting that mandate on July 17, 2017.

Hall then appealed her 2009 convictions to this Court a second time on August 15, 2017, but the appeal was dismissed on the grounds that notwithstanding the direction from the Eleventh Circuit for a "new direct appeal," this Court was without jurisdiction to consider a second direct appeal from the same final judgment. See *Hall v. State*, 304 Ga. 281 (2018). On August 31, 2018, Hall filed a motion in the trial court to set aside the judgment

Hall argues that the trial court erred in admitting (i) other-acts evidence about her conduct towards her ex-husbands, and (ii) two recorded statements made by her eight-year-old daughter immediately after the shooting and several days after the shooting. Hall also argues that the cumulative harm from these errors warrants a new trial. For the reasons that follow, we affirm.

The evidence presented at trial showed that on July 30, 2008, Hall called 9-1-1 just after 8:00 p.m. and reported that she and Britt had been "fighting" and that Britt "shot at" her, "said he was going

"pursuant to the United States Court of Appeals for the Eleventh Circuit and the Georgia Supreme Court," and sought a retrial. Following a hearing on October 29, 2018, the motion was denied on November 2, 2018.

While concurrently seeking habeas relief in federal court, Hall again appealed to this Court on November 30, 2018. See *Hall v. State* (S19A1108). On April 11, 2019, during the pendency of that appeal, the district court ordered the State to grant Hall a new trial due to the ineffective assistance of her appellate counsel. On June 10, 2019, the trial court, complying with this direction, ordered that Hall's conviction be set aside and for a new trial be scheduled. Hall then withdrew her appeal to this Court. See *Hall v. State* (S19A1108) (motion to withdraw granted May 3, 2019).

At a retrial from October 7 through 15, 2019, a jury found Hall guilty of Counts 2 and 3. The trial court sentenced Hall to serve life in prison for Count 2. Count 3 was merged with Count 2 for sentencing purposes.

On November 14, 2019, Hall filed a timely motion for new trial, which was amended on July 26 and December 22, 2023. The parties waived a hearing, and the trial court denied the motion, as amended, on August 12, 2024. On the same day, Hall filed a notice of appeal. The case was docketed to the April 2025 term of this Court and submitted for a decision on the briefs.

to kill himself," and then "shot himself." Hall and Britt had been married since September 2006, and were experiencing stress as a result of serious financial difficulties and contentious relationships with their former spouses.

When first responders arrived, they found Britt "lying on his back on the floor" in the bathroom, and he was pronounced dead. Paramedics and officers quickly noted that Britt had multiple gunshot wounds – to his chest, leg, and arm – and that the circumstances did not appear consistent with a suicide.

A revolver with six spent rounds in the cylinder, a loose shell casing, and an unloaded, live round were lying next to Britt's body.[2] There was also a trail of blood leading into the bathroom. Several rounds had been fired into the house in various locations, and unspent rounds were found in both the garage and the office areas.

An officer testified that Hall showed him "a mark under her chin ... [where she said Britt] put the gun up under her head and her

_____

[2] The State's firearms expert testified that the safety features on the revolver were "all operational and functional" and that significant force was required to pull its trigger.

throat and told her that if she didn't leave he was going to kill her." She told the officer that they "were fighting all over the house ... over the gun and it went off." She said that, after Britt shot himself, she fired the gun into the floor to unload it.

Hall demonstrated to two other officers how, while they were fighting, Britt put the gun "[c]ompletely up against his chest" and "killed himself." However, the officers did not see evidence indicating that the gunshot to Britt's chest was a "pressed contact wound" as expected based on Hall's description. The medical examiner also testified that the fatal shot to Britt's chest was not a "pressed contact injury" but was likely inflicted from a "close range of fire," "maybe up to six inches away."

In a subsequent interview with an investigator, Hall did not mention self-defense or that Britt had shot at her. Instead, she described their struggle for the gun and how the gun went off several times. She said she hoped that if she kept "shooting it at things, it's gonna run out of bullets." She was unsure which shot hit Britt's leg but saw that he was on the ground and that his leg was bleeding. At

4

that point, she said she went out to the garage to "get all the bullets out" but did not know how to "work that gun." She came back inside – while still holding the gun – and sat down on the floor to talk with Britt. She demonstrated how Britt reached out like he wanted to hug her but was "holding [her] down" when the shot hit his chest. She then told the investigator that she "didn't shoot him on purpose." In a second interview, Hall said that "she always had the gun ... Britt never had the gun."

Alissa Davis – Hall's daughter from a previous marriage who was eight years old at the time of the shooting but nineteen years old at the time of the retrial – testified that Hall and Britt had been arguing that evening. At one point, a "vacuum was thrown," and Alissa was told to go up to her room. From her room, she heard "screaming and hollering" downstairs – mostly from Hall – and then someone said "Alissa[,] stay in your room."

Alissa testified that she heard more yelling and then Britt said, "[P]ut the gun down" multiple times – each time "a little louder, a little more forceful to make sure [Hall] did it" – and then "[Hall],

5

don't do this." She then heard a few gunshots, followed by a period of "calm," a few more gunshots, and Hall "screaming more."[3] In total, Alissa believed approximately six shots were fired.

1. Hall argues that the trial court erred by admitting other-acts evidence pursuant to OCGA § 24-4-404(b) ("Rule 404(b)").

(a) *Background*

Before trial, the State filed a notice of its intent to introduce other-acts evidence – specifically, four prior acts of violence by Hall against her first two husbands: Rusty Hart and Steve Davis – pursuant to Rule 404(b). In addition to Hart and Davis, the State proffered that it also intended to call Andy Binion, who was a witness to one of the incidents involving Davis. During a pre-trial hearing on the issue, the State contended that the acts were admissible to demonstrate Hall's motive, intent, and absence of mistake or accident. In response, Hall's counsel argued that the acts

---

[3] As discussed in more detail in Division 2 (a) below, Alissa testified at the 2019 trial that she could not remember the "exact sequence" of these events or certain details that she had previously recounted. The State attempted to refresh her recollection with the testimony she provided at the 2009 trial, but it was mostly unsuccessful.

constituted propensity evidence and did not show a motive or intent to control, that the evidence "offered by the State shows ubiquitous facts that are common amongst domestic disputes and not a specific motive to establish control," that the specific intent of the charged crimes was different than that of the offenses that occurred in the other-acts evidence, and that "any relevance or any probative value is substantially outweighed by the risk."

The court found that (1) the evidence was "relevant to show motive[,] ... intent, and absence of mistake[;]" (2) the probative value was "not substantially outweighed by the danger of unfair prejudice[;]" and (3) there was "sufficient proof for a jury to find by a preponderance of the evidence that [Hall] committed those acts." Hall subsequently asked for a continuing objection to the admission of Hart's, Davis's, and Binion's testimony under Rule 404(b), which the trial court permitted.[4]

---

[4] Even though Hall was granted a continuing objection under Rule 404(b) to the admission of the evidence, the State argues that any error was not preserved because Hall failed to thereafter object to "any and all testimony by the ex-husbands that went beyond what the trial court previously admitted

In line with its proffer, the State called Hart, Davis, and Binion. Hall's first ex-husband, Hart, testified that, during a party, Hart talked with Hall's sister and told her that his relationship "wasn't going very good at all," that he "was falling out of love with [Hall]," and that he "loved [Hall's sister] more than [Hall]." Hall later learned about the conversation and "punched [Hart] in the nose." Hart then described a conflict just after his and Hall's divorce wherein he went to the marital home to gather his belongings and addressed Hall about having someone "of the opposite sex spend the night in the house." When Hart turned to leave, Hall "picked up a cordless phone off the wall and hit [him] in the back of the head with it."

Next, the State called Davis, Hall's second ex-husband. Davis testified about a time when he forgot to bring home ice from the store, and Hall became "very upset" and went on "a tirade," during

---

pretrial as 404(b) evidence." However, as we have explained, "[c]ontinuing objections eliminate the need to repeat an objection where the trial court's ruling on the first objection clearly covers subsequent proceedings and the court has granted a party the right to have a continuing objection." *State v. Larocque*, 268 Ga. 352, 353 (1997).

which she "began to push and shove toward [him], [and tried] to kick [him]" in the shin. Davis also recounted an incident while he was preparing to leave for a business trip. Hall became "very agitated" and "very aggressive," and – as Davis was leaving the house – Hall "began to strike [him] on the back and chase [him] to [his] truck." Davis described that Hall "stood between the door of the truck and the frame of the truck" and "wouldn't let [him] shut the door." Hall finally relented, but when Davis attempted to back out of the driveway, Hall was "standing behind the truck" and told him to "run her over."[5]

(b) *Analysis*

Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." OCGA § 24-4-404(b). This evidence, however, may be admissible for other purposes, such as

---

[5] Binion, one of Davis's employees, witnessed this event. Binion testified that he went to Davis's residence to pick up his paycheck and saw Hall chasing and hitting Davis – either with her fists or with a bag – and screaming at him to "run over her" with his vehicle.

"proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," if the evidence is relevant for proving that other purpose. Id. "Relevant evidence is defined under OCGA § 24-4-401 as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Pritchett v. State*, 314 Ga. 767, 775 (2022) (cleaned up).

Along with having to be relevant to an issue other than character, evidence admitted under Rule 404(b) must pass the test of OCGA § 24-4-403 ("Rule 403") – in that its probative value is not substantially outweighed by the danger of unfair prejudice – and must be sufficient to permit the jury to conclude by a preponderance of the evidence that the accused actually committed the other act. See *Harrison v. State*, 310 Ga. 862, 867 (2021). "A trial court's decision to admit evidence under Rule 404(b) will be disturbed only if it constitutes a clear abuse of discretion." Id.

   (i)  *Motive*

10

The State argues that the other-acts evidence was admissible to show Hall's motive to harm and control Britt because Hall had previously acted violently towards her ex-husbands. See *Harris v. State*, 314 Ga. 238, 270 (2022) ("We have described motive as the reason that nudges the will and prods the mind to indulge the criminal intent." (cleaned up)). We recently considered a similar scenario in *Harris v. State*, 321 Ga. 87 (2025), in which the trial court admitted evidence of the defendant's prior aggravated battery against his ex-girlfriend for the purpose of showing motive, among other things, and we held that the admission was improper. In that case, the other-acts evidence was admitted to prove that the defendant's "motive in killing [the victim] was to control her with violence, and this was the same motive shown in the [prior] incident with [his ex-girlfriend]." 321 Ga. at 91 (cleaned up). We held that the trial court erred in admitting the other-acts evidence to show the defendant's "motive to control intimate partners with violence" because it was a generic motive that served as a "classic improper propensity argument," and no sufficient "logical link" existed

11

between the alleged motive and the alleged crimes. Id. at 98.

The trial court here similarly erred in admitting the other-acts evidence to prove that Hall had the motive to control intimate partners with violence. This motive is generic, and neither Hall's prior acts against Hart and Davis nor her shooting of Britt had a strong logical connection to a motive to use violence to control intimate partners. Instead of motive, the prior acts primarily demonstrated that when Hall became angry in the past at her ex-husbands, she used violence against them, such that she was more likely to have behaved that way against Britt. Thus, it was a clear abuse of discretion for the trial court to admit this evidence for the purpose of proving Hall's motive in shooting Britt.

(ii) *Intent and Absence of Mistake or Accident*

We reach a different conclusion with respect to the admission of the other-acts evidence to show intent and absence of mistake or accident. Although Hall claimed in the 9-1-1 call that Britt "shot at" her and in a subsequent interview said that she shot Britt in self-defense, Hall also specifically stated in her interview that Britt

either shot himself or that she accidentally shot him. And Hall did not testify to take the issue of intent off the table at trial (i.e., by claiming only justification). Furthermore, the facts here, while more severe, are similar to the prior acts, in that each prior act involved violence against a romantic partner which was motivated by anger. Thus, Hall's "prior acts of intentional violence or threats" against her ex-husbands made it more probable that the shooting of Britt was "done intentionally rather than by accident," and thus were relevant to proving intent and absence of mistake or accident. *Harrison*, 310 Ga. at 867 (where defendant entered a plea of not guilty, claimed the shooting was accidental, and did not take "affirmative steps ... to remove intent as an issue," he made intent a material and "particularly salient" issue, and the State could prove it with qualifying Rule 404(b) evidence). See *United States v. Miers*, 686 FApp'x 838, 841–42 (11th Cir. 2017) (prior incidents in which defendant had beaten his ex-girlfriends and ex-wife were admissible to show defendant's common intent "to harm, restrain, and/or dominate" women and his absence of mistake in kidnapping and

13

interstate domestic violence charges); *United States v. Reid*, 2025 WL 1235126, \*3 (11th Cir. 2025) (evidence of defendant's prior distributions of child pornography was "probative of permissible purposes under Rule 404(b), including intent," where State was required to prove that defendant "knowingly" distributed and transported child pornography, and the "extrinsic conduct was essentially the same as the charged conduct, and so was unlikely to inject emotions into the jury's decision-making not already present in the case" (cleaned up)); *United States v. Edouard*, 485 F3d 1324, 1344–46 (11th Cir. 2007) (defendant's prior drug smuggling activities were relevant to whether he possessed the requisite intent for a cocaine-trafficking conspiracy where both offenses involved the same mental state).[6] Cf. *Harris*, 321 Ga. at 99 (concluding that the other-acts evidence was not properly admitted to prove absence of mistake or accident because the defendant testified at trial that he

---

[6] Because Rule 404(b) "is modeled on its counterpart in the Federal Rules of Evidence, we may look to federal appellate precedents interpreting [Federal Rule of Evidence 404(b)] for guidance in applying the state provision." *Pritchett*, 314 Ga. at 775 n.6 (2022) (citation and punctuation omitted).

14

acted in self-defense, not by mistake or accident, which affirmatively took the issue off the table).

Accordingly, the trial court did not abuse its discretion in determining that the other-acts evidence was relevant to proving Hall's intent and absence of mistake or accident.

(iii)    *Remaining Prongs of the Rule 404(b) Test*

We have concluded that the other-acts evidence satisfies the first prong of the Rule 404(b) test because it was relevant to an issue other than Hall's character (namely, her intent and absence of mistake or accident). In evaluating the second prong, we examine both the probative value and the prejudicial impact of the other-acts evidence. See *Harrison*, 310 Ga. at 867.

"In assessing the probative value of other acts evidence in proving intent, we consider the acts' overall similarity to the charged crimes, their temporal remoteness, and the prosecutorial need for it." *Harrison*, 310 Ga. at 867–68. As discussed above, this other-acts evidence has probative value: because Hall behaved in an intentionally violent way towards her ex-husbands, it is less likely

that she shot Britt by mistake or accident. The prior acts were similar to the charged crimes – both involved violence against a romantic partner, motivated by anger. See *Harrison*, 310 Ga. at 868 ("[T]he prior acts were similar to the charged crimes, as both sets of acts involved threats and violence against a romantic partner … apparently motivated by jealousy and anger.").

And while the prior acts were somewhat remote in time from the charged crimes, the prosecutorial need for the evidence was high to disprove Hall's defenses. Hall claimed that the shooting was an accident or self-defense, and there was little direct evidence, aside from Hall's own account, of how the shooting transpired. See *Harrison*, 310 Ga. at 868 (evidence of defendant's prior threats and violence against a romantic partner were properly admitted where defendant "claimed the shooting was an accident, and there was no direct evidence, aside from [his] own account, of how the shooting transpired"); *Miers*, 686 FApp'x at 842 ("[T]he prior acts were the only evidence the government had to refute [defendant's] theory of consent aside from [victim's] own testimony and the video of her

16

alleged abuse.").

Moreover, the past acts were not of a particularly inflammatory nature, the injuries to Hart and Davis were not significant, and the evidence was not heavily relied on to prove the State's case – the State made no mention of this evidence in closing.[7] Cf. *Harris*, 321 Ga. at 103–04 ("[T]he State not only relied on this [other-acts] evidence but leaned into the classic propensity argument throughout its closing, telling the jury that [defendant's] battery of his ex-girlfriend showed that [his] 'motive is to control romantic partners with violence. *That's what he does. That's what he did in this case.*'"). Thus, any unfair prejudicial effect did not substantially outweigh the probative value of the evidence, and was mitigated by the trial court's limiting instruction, given before the introduction of the other-acts evidence and again during the final charges. See *Harrison*, 310 Ga. at 868 (the unfair prejudice inherent

---

[7] Although Hall argues that the State did mention this evidence in closing by stating that Hall "has got all of these problems with exes," the State was not referring to any of the challenged evidence here but rather issues with "fighting over custody."

17

in the other-acts evidence did not substantially outweigh its high probative value, particularly given that the trial court "instructed the jury, both prior to [ex-girlfriend's] testimony and at the close of the evidence, that this evidence was to be considered only for the limited purposes for which it was admitted").

With regard to the third prong of the Rule 404(b) test, there is little doubt – and Hall does not dispute – that the testimony provided by Hart, Davis, and Binion sufficed to establish by a preponderance of the evidence that Hall did in fact commit the acts about which they testified. Accordingly, we conclude that there was no clear abuse of discretion in the trial court's admission of the other-acts evidence for the purpose of proving Hall's intent and absence of mistake or accident in shooting Britt.[8] See *Harrison*, 310 Ga. at 869.

2. Hall contends that the trial court erred in admitting State's

---

[8] Because we conclude that this evidence was properly admitted for proving intent and lack of mistake or accident, and Hall argues only that the evidence was erroneously admitted, we need not address any argument that also admitting the evidence for proving motive was harmful. See *Naples v. State*, 308 Ga. 43, 52 n.9 (2020).

Exhibits 25 and 26 – two recorded statements made by her eight-year-old daughter immediately after the shooting and several days after the shooting – over trial counsel's hearsay objections. Again, we disagree.

(a) *Background*

The State called Alissa as a witness at trial. After Alissa testified about what she remembered from the night of the shooting, the State asked Alissa to identify State's Exhibit 25: an audio-recorded interview she had with an investigator immediately after the shooting on July 30, 2008, in her grandmother's car that was parked at her house, during which she was "[s]till scared" and "stressed from what had just occurred." Hall's counsel made a hearsay objection to the admission of the exhibit, to which the State responded that it was admissible as an excited utterance. The court overruled the objection, and the State published the recording to the jury.

In that interview, Alissa said, among other things, that she heard "gun noises" after Britt said, "[P]ut the gun down." After the

19

audio was played and during cross-examination, Hall's counsel called into question Alissa's memory of the events by utilizing a variety of sources – a transcript of Alissa's audio recording presented as a demonstrative aid, a handwritten account of what Alissa said to one of her teachers in April of 2009, and Alissa's testimony at the prior trial in this case.

Specifically, Hall's counsel asked Alissa whether she remembered the portions of the audio recording in which she told the investigator that: Hall said "I can't breathe"; "[Hall] was breathing so hard"; and there was a pause between gun noises. She was unable to recall at the second trial these details that she provided 11 years earlier. Alissa also acknowledged speaking to her teacher in 2009 but testified that she did not remember conveying that "both [Hall] and [Britt] were punching each other" or that "[Hall] had blood coming from her nose." Hall's counsel briefly brought up the fact the Alissa had regularly spoken with her father, Davis – Hall's ex-husband – about what had happened that night. Hall's counsel then used the 2009 trial transcript to question Alissa,

who testified that she did not remember seeing "[Hall] and Britt fighting" or Britt "shooting the handgun the day before," despite her testimony at the first trial.

On re-direct, the State asked Alissa to identify State's Exhibit 26, which was a video-recorded interview that she had with the investigator on August 5, 2008 – less than a week after the shooting. Hall's counsel objected to the exhibit as hearsay, to which the State responded that Alissa's statements in the video were admissible as prior consistent statements pursuant to OCGA § 24-6-613. The court ruled, "I'll allow it," and the video was published to the jury.

In that interview, Alissa repeated some of the events from July 30, such as hearing two separate volleys of gunshots. Alissa also described how Britt said, "[P]ut the gun down" ten times.

(b) *Analysis*

Hall correctly points out that the interviews that Alissa gave in State's Exhibits 25 and 26 contained hearsay statements about the events on the night of the shooting. See OCGA § 24-8-801(c) (defining hearsay as "a statement, other than one made by the

21

declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). However, we conclude that the trial court did not abuse its discretion in determining that Alissa's statements in State's Exhibit 25 fell within the excited utterance exception to the hearsay rule. And even presuming that the statements in State's Exhibit 26 were improperly admitted, the admission was harmless.

(i)     *Exhibit 25*

The audio-recorded interview between Alissa and the investigator immediately after the shooting was admissible as an excited utterance. The excited utterance exception, found in OCGA § 24-8-803(2), says that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" shall not be excluded by the hearsay rule. See *Blackmon v. State*, 306 Ga. 90, 94 (2019) (trial court reasonably concluded that defendant's threat to shoot at a car the victim was in was a startling event and that the victim's statements just moments later were made while she was still under

22

the stress of the roadway threat).

The declarant need not express any particular emotion when making the statement as long as she remains under the stress caused by the startling event. See *Blackmon*, 306 Ga. at 96. And the trial court has wide discretion to admit or exclude evidence and should consider the totality of the circumstances in determining whether the statement was made while still "under stress." See *Coston v. State*, ___ Ga. ___, ___ (2025 Ga. LEXIS 123) (trial court did not abuse its discretion in admitting witness's statement made 20 minutes after the murder, while the witness was still on scene and "upset," as an excited utterance); *Munn v. State*, 313 Ga. 716, 725 (2022) (trial court did not abuse its discretion in admitting as excited utterances witnesses' statements, made as they were screaming and crying, approximately ten minutes after the shooting and while victim was still on the scene bleeding to death); *Robbins v. State*, 300 Ga. 387, 389–90 (2016) (quoting *U.S. v. Belfast* (11th Cir.), held that the trial court did not abuse its discretion in admitting statements made by victim – who had been beaten by her

husband throughout the night – to a relative the morning after the beating as excited utterances).

Though she was not an eyewitness to the shooting, Alissa testified that she sat in her room, feeling "scared," as she overheard yelling between her parents and then subsequent gunshots. Moreover, she recalled that she was "still scared" and "stressed" during the initial interview with the investigator, which took place "right after" the incident in her grandmother's car on the property. The record supports the trial court's conclusions that the shooting was a startling event and that Alissa was under the continuing stress of excitement when she made the statements in State's Exhibit 25. Accordingly, the court did not abuse its discretion in admitting this evidence over the hearsay objection.

(ii)     *Exhibit 26*

Even assuming that the trial court erred in admitting State's Exhibit 26 as a prior consistent statement, the error is harmless. See *Allen v. State*, 315 Ga. 524, 534–36 (2023) ("[B]ecause we conclude that any error in admitting [the witness's] statement was harmless,

24

we need not address whether it was admissible as a prior consistent statement under OCGA § 24-6-613(c).").[9] It is highly probable that any error in admitting the statements did not contribute to the verdict. Alissa's statements in this exhibit were "largely cumulative" of her statements in Exhibit 25. Additionally, other evidence presented was strong, such as the medical examiner's conclusion that the evidence was incompatible with suicide, and Hall's changing stories of what happened that night. See *Puckett v. State*, 303 Ga. 719, 722 (2018) (any error in admitting the prior consistent statements was harmless where "the testimony was largely cumulative of the unobjected-to testimony of [other witnesses]"); *Hood v. State*, 299 Ga. 95, 105–06 (2016) (wrongly admitted evidence

---

[9] "Where improper bolstering has occurred, [the harmless error analysis] must be made without reliance on the testimony that was improperly bolstered." *McGarity v. State*, 311 Ga. 158, 167 (2021). However, it should be noted that we have recently questioned whether that approach makes sense, noting that we "may have conflated the improper admission of hearsay statements that repeated the live witness's testimony with 'bolstering' – a term that more precisely describes the scenario of one witness vouching for the credibility of the other." *Harmon v. State*, 219 Ga. 259, 266 n.7 (2024). But regardless, even applying this approach by not considering Alissa's trial testimony in the harmless error analysis, the assumed error here is still harmless.

of drug deals was harmless given "strong" evidence of defendant's guilt and other properly admitted evidence that he had distributed drugs to people other than the murder victim).

3. Hall argues that the cumulative harm from these errors warrants a new trial. We "consider collectively the prejudicial effect, if any, of trial court errors," *State v. Lane*, 308 Ga. 10, 17 (2020), and determine "whether the cumulative prejudicial impact of these admissions requires a new trial." *Greene v. State*, 316 Ga. 584, 607 (2023). To establish cumulative error, Hall must show that (1) at least two errors were committed during the trial and (2) considered together with the entire record, the multiple errors so infected the jury's deliberation that they denied her a fundamentally fair trial. See *Greene*, 316 Ga. at 607–08.

Even if Hall's prior acts against her ex-husbands should not have been admitted for the purpose of demonstrating motive and we presume that the State's Exhibit 26 was improperly admitted hearsay, these errors did not deny Hall a fair trial. The other-acts evidence was properly admitted for the purpose of showing Hall's

26

intent and absence of mistake or accident, so the jury would have heard the testimony from her ex-husbands despite any error in admitting the evidence to show motive. And it is unlikely that Exhibit 26 contributed to the verdict in any meaningful way, as it was not heavily relied on by the State and was largely cumulative of other evidence that was properly admitted. See *Greene*, 316 Ga. at 608 (defendant was not entitled to a new trial "[i]n light of the harmlessness of the evidentiary errors in question and in light of the other substantial evidence heard by the jury" in the case, and where defendant did not show that, because of the errors, he was denied a fundamentally fair trial). In short, Hall has not "explain[ed] to the reviewing court just how [s]he was prejudiced by the cumulative effect of multiple errors." *Lane*, 308 Ga. at 18.

*Judgment affirmed. All the Justices concur, except Land, J., who concurs in judgment only. Warren, P.J., disqualified, and Pinson, J., not participating.*