NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 3, 2026

S26A0435. HAMILTON v. THE STATE.

PETERSON, Chief Justice.

Rodriquez Lamont Hamilton appeals his convictions for felony murder and other offenses, stemming from the fatal shooting of Jamarius Cowart and non-fatal shooting of Allysia Bryant.[1] Hamilton argues that the trial court abused its discretion by (1)

---

[1] The crimes occurred on November 2, 2022. On January 23, 2023, a Glynn County grand jury returned an indictment charging Hamilton with malice murder (Count 1), felony murder predicated on the aggravated assault of Cowart (Count 2), aggravated assault for shooting Bryant (Count 3), and two counts of possession of a firearm during the commission of a felony (Counts 4 and 5). At a December 2023 trial, a jury found Hamilton not guilty of malice murder and guilty of the other counts. On December 21, 2023, the trial court sentenced Hamilton to life in prison without the possibility of parole for felony murder and consecutive sentences of 20 years in prison for the aggravated assault of Bryant and 5 years in prison for each of the firearm possession counts. Hamilton filed a timely motion for new trial, which was amended in May 2025. Following a hearing, the trial court denied the motion in an order entered on October 1, 2025. Hamilton filed a timely notice of appeal, and the case was docketed to this Court's term beginning in December 2025 and submitted for consideration on the briefs.

denying a motion for mistrial based on an emotional outburst in the courtroom; (2) denying a motion for mistrial based on testimony by an officer that Hamilton had invoked his right to remain silent; and (3) admitting various evidence about prior difficulties between Hamilton and the victims. Hamilton also makes a cumulative error argument. We conclude that Hamilton has not shown an abuse of discretion by the trial court in denying his requests for mistrial and that any abuse of discretion in admitting the evidence in question was harmless, and we affirm.

The evidence at trial showed that in November 2022, Hamilton and Bryant were sharing a home in Brunswick with their children. They had been in and out of a romantic relationship for the previous decade, but in November 2022, Bryant had been dating Cowart instead for about six months. As discussed in more detail below, Bryant and Hamilton's relationship had been tumultuous, with Hamilton at times being violent toward Bryant and stealing her belongings, both before and after she began seeing Cowart.

Bryant testified at trial as follows. On the night of November

2, 2022, Bryant told Hamilton that she was going to church. Instead, she went to a restaurant in Brunswick where Cowart was working. When Cowart got off work, Bryant drove off in her car with Cowart in the passenger seat. At some point, Cowart asked Bryant if a truck on the road was her "baby daddy cab," and Bryant looked and recognized Hamilton's truck. Shortly thereafter, when stopped at a red light at the intersection of Crispen and Old Jesup, Bryant observed Hamilton's truck stopped next to her car. The passenger side window of Bryant's car was down. No words were exchanged, but Hamilton fired several shots at Bryant's car. Bryant could see Hamilton's eyes and recognized that he was firing her black Glock .40-caliber handgun — which she had left at home that night — with his arm out of the window. Bryant was shot in the back, and she could tell that Cowart had been shot. Bryant continued driving straight, while Hamilton turned right, before Bryant stopped and called 911, then encountered police. Bryant had been driving a silver Chrysler sedan and reported that Hamilton drove a silver Ford F-150 truck.

An officer driving nearby encountered Bryant's vehicle approaching at a high rate of speed shortly after 11:00 p.m. Bryant drove around the officer, stopped her car in the middle of the road, got out of the car, and ran over screaming that her boyfriend had been shot. Cowart died at the scene. Bryant told 911 and a responding officer that her "baby daddy" had shot her boyfriend, told the responding officer that she believed that she had been shot, as well, and identified Hamilton by name to the responding officer and an officer who interviewed her at the hospital.

A motorist, Nicolas Fryar, testified at trial about what he saw and heard near the intersection of Crispen and Old Jesup at the time of the shooting. He said he saw a light-colored truck next to a dark-colored car, the driver of the truck looking "animated." Just before a stoplight turned green, he heard a "pop, pop, pop," after which the two vehicles drove off fast in opposite directions.

Surveillance video from an area business from the night of the shooting showed a silver pickup truck — which appeared to be a Ford F-150 and which Bryant identified as Hamilton's — turning on

4

to Crispen a few minutes before Bryant's car did. Other surveillance video showed Bryant's car passing the truck, which had been parked along Crispen and began to move only as Bryant's car approached. Another video showed the two vehicles side by side at the intersection of Crispen and Old Jesup, before the sedan proceeded straight and the truck turned right.

The jury also heard from Zacchaeus Benton, an acquaintance of Hamilton. Benton recalled a night on which Hamilton arrived unexpectedly at Benton's house, which was a few miles away from the site of the shooting. Hamilton asked for a ride and permission to leave his truck at Benton's house. Benton drove Hamilton about five minutes away and dropped him off at a stop sign. Surveillance video outside Benton's house showed a person identified by Benton as Hamilton arriving at 11:38 p.m. on the night of November 2, 2022, then leaving with Benton in Benton's vehicle. On cross-examination, Benton testified that Hamilton had left his vehicle there before and that "nothing that night was out of the ordinary" to him. Police found Hamilton's truck at Benton's house. About a month after the

shootings, Hamilton turned himself in to law enforcement with the assistance of counsel.

Shell casings recovered from both the intersection of Crispen and Old Jesup and Bryant's vehicle were fired from the same firearm, bullets recovered from Cowart's autopsy and a bullet found in Bryant's vehicle were fired from the same firearm, and those casings and bullets all were consistent with being fired from a Glock .40-caliber pistol. Bryant testified that she never saw her Glock .40-caliber handgun after the night of the shooting, although police came and collected the gun's box months after the shooting. A detective testified that no .40-caliber handgun was ever recovered in connection with the case.

Hamilton did not testify at trial. His lawyer emphasized to the jury that the truck driven by the shooter was a common model and color, questioned whether Bryant had actually seen the shooter's face, and suggested that Bryant may have been influenced by

threats from Cowart's family.[2] Counsel also suggested in closing that the police had failed to investigate other possible perpetrators, such as another romantic partner of Bryant or someone involved in a prior invasion of her home.[3] Counsel in closing did not appear to dispute that Hamilton went to Benton's house after the shooting, arguing this was not indicative of Hamilton seeking help after having committed a crime, as Benton was a mere acquaintance, and Hamilton had parked his truck there before.

1.    On appeal, Hamilton argues that the trial court abused its discretion in denying Hamilton's request for a mistrial after an emotional outburst by Cowart's family while the State was playing video footage that showed Cowart's body. We conclude that Hamilton has not shown an abuse of discretion.

During the testimony of the officer who first encountered Bryant after the shooting, the State played the officer's body-worn

---

[2] Bryant testified that she had been threatened and "jumped" by members of Cowart's family since the shooting.

[3] Bryant testified that a few months before the shootings, her home with Hamilton was broken into and the two were held at gunpoint by masked intruders.

7

camera footage. The transcript indicates that while the video was playing, someone in the courtroom made an outburst. Defense counsel requested a bench conference, and the transcript notes two more outbursts, one while the prosecutor was addressing the trial court and another while the jury was escorted out of the courtroom; the transcript also notes that "the family" was escorted out at this time. Defense counsel initially said, "I don't know that it quite rises to the level of a mistrial[.]"But after the prosecutor implied that he had warned Cowart's family about the contents of the video and warned about making outbursts, defense counsel moved for a mistrial "just due to the level of what just transpired and the fact that they knew what was there and they knew what was coming." The trial court denied the mistrial and admonished members of Cowart's family who had returned to the courtroom. The trial court indicated it was going to instruct the jury, but before the jury was brought back into the courtroom, the trial court stated, "I know that's not your preferred way to handle it," and, "I know that's your backup request." The court then charged the jury as follows:

Ladies and gentlemen, before we broke we had [a] little incident in the courtroom. I know everybody noticed it. The family of the victim had an outburst. I would instruct you to disregard the outburst or outcry that was in court, that was in the courtroom. Your verdict, when you get to it, should be a verdict based upon the evidence according to law I give you. You should not show favor or sympathy to one side or the other. It's your duty to consider all the facts objectively without favor, affection or sympathy to either party, so I instruct you to disregard any instances like that. Hopefully, that won't happen again but you can understand why it does happen, but it should not affect your decision in the end, when you get to decide the case.

After the trial court instructed the jury, it asked, "Any additional instructions?" Defense counsel stated, "no," and did not renew her request for a mistrial.

Pretermitting whether this enumeration of error was preserved,[4] Hamilton has not shown an abuse of discretion in the trial court's ruling. "A trial court generally has broad discretion in deciding whether to grant a mistrial, and great deference is afforded to a court's determination that a mistrial was not necessary." *Thomas v. State*, 311 Ga. 573, 576 (2021). "The measures a trial

---

[4] But see *Jivens v. State*, 317 Ga. 859, 866 (2023) (where defendant fails to renew motion for mistrial following trial court's curative instruction, he waives issue of denial of mistrial for appeal).

court takes in response to a courtroom outburst are within the court's discretion unless a fair trial is not possible without a new trial." Id. "Generally, a trial court does not abuse its discretion when it takes prompt, thorough, and curative action." Id. (quotation marks omitted). "When juries are given curative instructions following such outbursts, they are presumed to follow them in the absence of proof to the contrary." Id. (cleaned up).

Here, the trial court admonished family members about the outburst. The trial court instructed the jury to disregard the outburst in detailed remarks. Although Hamilton suggests that the curative instruction was insufficient because the State's case was weak, the State's case included a clear eyewitness identification of Hamilton as the shooter by someone who knew him well, corroborated by other evidence. And Hamilton otherwise has not even attempted to argue with any specificity how the outburst of which he complains — the nature of which is not detailed in the record — affected the verdicts or pointed to any evidence that the jury disregarded the instruction. Therefore, he has not shown

10

reversible error. See *Thomas*, 311 Ga. at 576–77 (no abuse of discretion in denial of mistrial after victim's son screamed at the defendant, "You killed my daddy," during trial in the courtroom, even where multiple members of the jury indicated the outburst caused them concern, where court received reassurance from all jurors that the outburst would not impair their ability to be fair and impartial and told the jury to disregard the outburst and that the man who made the outburst was excluded from the courthouse); *Thompson v. State*, 304 Ga. 146, 154–55 (2018) (trial court did not abuse its discretion in denying motion for mistrial after a witness under cross-examination said repeatedly, "Y'all done killed somebody," and "Y'all going to hell," where the court directed the jury to disregard the outburst); *Messer v. State*, 247 Ga. 316, 323–25 (1981) (concluding that the trial court did not abuse its discretion by refusing to declare a mistrial after the father of the victim lunged at the defendant and screamed, "You'll pay," "You're liable," and "[Y]ou're going to get it," where the court gave a curative instruction and asked jurors whether the outburst would affect their verdict).

11

2. Next, Hamilton argues that the trial court abused its discretion in denying Hamilton's request for a mistrial after a detective testified about Hamilton's refusal to make a statement to law enforcement when he was arrested.

Testifying at trial about Hamilton turning himself in to law enforcement, a detective volunteered without prompting that Hamilton "was not willing to make a statement at that time." The jury was excused at the request of the prosecutor, who told the court, "Obviously that was not a planned response. In fact, the detective and I had talked about this during the lunch break about not making any reference." Hamilton's counsel made a motion for a mistrial, citing both the Sixth Amendment to the United States Constitution and the Georgia Constitution and arguing that "[a] curative instruction will not fix this." The trial court denied the motion. The trial court gave a curative instruction instructing the jury to disregard the detective's statement as improper:

> Ladies and gentlemen, just before we broke the officer gave testimony about the defendant refused to give a statement when he first turned himself in. The State

12

always has an unalterable burden of proof beyond a reasonable doubt in these cases, and the defendant has an absolute right to remain silent. So it was improper, the statement that was made was not done intentionally, but it — but it was a statement that came out inadvertently to you. So I'm going to instruct you to completely disregard that statement about him not giving a statement when he turned himself in. That has nothing — he has an absolute right to do that. It should not be regarded by you in any manner whatsoever.

The court then asked jurors to raise their hands if they could not follow the instruction; no one raised a hand. After the curative instruction was given, the defense renewed its motion for mistrial; the trial court did not respond, and examination of the detective resumed.

Whether to grant a mistrial due to an improper comment on a defendant's silence is a matter for the trial court's discretion that an appellate court will not disturb "unless there is a showing that a mistrial is essential to the preservation of the right to a fair trial." *Parker v. State*, 309 Ga. 736, 738 (2020) (quotation marks omitted). The detective's remark may well have been an impermissible comment on Hamilton's silence. But we need not decide that question, because even if it was, the trial court acted within its

discretion in denying the motion for mistrial. The comment was non-responsive to the prosecutor's question and made in passing. Further, the trial court instructed the jury to disregard the remark as improper. The jury is presumed to have followed that instruction. See id. at 739. And Hamilton has not offered any proof to rebut that presumption. Hamilton argues the weakness of the State's case — as evidenced, he says, by the length of the jury's deliberations and a note indicating that the jury thought that law enforcement did a poor job investigating — is itself evidence that the jury may not have followed the trial court's instructions.[5] But this is mere speculation as to what may have influenced jurors who had initially voted to acquit and therefore insufficient to show jurors disregarded the instructions. Cf. *Bradley v. State*, 234 Ga. 664, 668 (1975) (rejecting claim of error in denial of mistrial, where defendant's argument as

---

[5] The transcript indicates that the jury received the case around lunchtime on the third day of trial and returned its verdict midmorning the following day. During deliberations, the jury sent the court several notes, first stating it was "deadlocked 50 50," then indicating it was at eight votes for guilty and four for not guilty, then that it was "at a stalemate" at that vote despite being told to continue deliberating. In one note, the jury stated, "The only thing we agree on is the cops did a shoddy job."

14

to how prosecutor's remark may have been considered by the jury in disregard of curative instructions was "speculative" and "unlikely"). And, as noted above, the State's case was not weak. Therefore, this enumeration of error fails. See *Parker*, 309 Ga. at 738–39 (trial court did not abuse its discretion in denying motion for mistrial based on a detective's nonresponsive testimony that the defendant "didn't speak" and "didn't say anything" where the trial court instructed jury to disregard the comment, and the defendant provided no evidence that the jury disregarded the court's instruction).

3. Hamilton argues that the trial court abused its discretion in admitting evidence of "prior 'bad acts' and/or 'prior difficulties'" between him and the victims. Hamilton argues that the evidence did not meet the criteria for admissibility under OCGA § 24-4-404(b) ("Rule 404(b)") and did not qualify as intrinsic evidence. He also argues that the evidence should have been excluded under OCGA § 24-4-403 ("Rule 403"). We conclude that the trial court did not abuse its discretion in admitting at least some of this evidence as intrinsic, and any error in the admission of the rest of the evidence was

15

harmless.

The State filed a pre-trial motion to admit evidence of prior difficulties between Hamilton and the victims as intrinsic evidence. The defense responded that the evidence was not intrinsic, amounted to mere allegations supported by nothing more than Bryant's word, and was prejudicial and would lead to confusion of the issues. The State amended its motion to include specific incidents, attaching incident reports as documentation. At a pretrial hearing on the matter, the State argued that the evidence would show a pattern of violence and controlling behavior exhibited by Hamilton and that this evidence was admissible as intrinsic evidence or in the alternative under Rule 404(b) for the purpose of showing Hamilton's motive. The defense continued to object, referencing its prior brief and arguing that there was a lack of evidence that certain incidents had occurred. The trial court granted the State's motion, finding that the evidence was intrinsic because it was necessary to complete the story of the crime and inextricably intertwined with the evidence regarding the charged offenses, as

well as admissible under Rule 404(b) to show motive. The court also found under Rule 403 that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice, confusion of the issues, or misleading the jury.

Bryant testified at trial that she and Hamilton began dating while they were still in high school and that Bryant became violent toward her after high school. She also described him taking her belongings on occasion; she said she would "always get it back but just on his time." Bryant testified as follows about incidents described in the amended notice, as well as an incident involving damage to her car about a month before the shooting:

- In a December 2016 incident that prompted Bryant to call police, while Bryant was pregnant with her second child, Bryant and Hamilton had argued; she recalled the argument may have been "about cheating." Bryant found Hamilton taking her bed apart so that he could take it with him when he left their shared apartment. Hamilton "jacked [her] up by the shirt and pinned [her] on the bed[.]" Hamilton swung a bedrail at Bryant, hitting her in the face. He took a gun out of his pocket and started beating it on a dresser.

- In April 2019, after Bryant and Hamilton argued and she was "ignoring him," Bryant went to a friend's house. Hamilton blocked Bryant's car from leaving the friend's house by parking

17

behind it while the two were arguing and tried to force her to get out of the car. Bryant summoned police as a result of this incident, as well.[6]

- In July 2019, Bryant was trying to break up with Hamilton and ignoring his calls and texts. Hamilton found Bryant at her friend's house and took the keys from the inside of her vehicle, leading Bryant to make a police report. Hamilton later told Bryant that he put her keys in a mailbox.

- Shortly after Bryant began seeing Cowart, Hamilton sent Bryant a text message saying, "I found you," along with a photo of her car at Cowart's house. When Bryant tried to leave, her car was not working. She suspected that Hamilton, who was a mechanic, had disabled her car.

- At some point after Hamilton found out about Bryant seeing Cowart, Hamilton and Cowart reported to Bryant that they had run into one another at a convenience store, and Bryant later saw Hamilton following Cowart.

- About a month before the shooting, while Bryant was at Cowart's house, Hamilton slashed Bryant's tires, "unhooked something" related to her tires, and "switched the computer" in her car. Bryant suggested in her testimony that Hamilton admitted to her that he did these things to her car that day.[7] Bryant did not report this incident to police.

- About a week before the shooting, when Bryant told Hamilton that she was not going to stop seeing Cowart, Hamilton

---

[6] The State also admitted through Bryant's testimony a written statement that she had given to a prosecutor about this incident, saying it was a "misunderstanding" and Hamilton was "not violent at all."

[7] When asked if Hamilton said anything to her about this, she replied, "Yes. That's how I knew not to move the car that day. … He said that he unhooked my tires, or did something with the — I don't know — he unhooked something."

punched Bryant in the face; police responded, but Bryant told them it was a misunderstanding.

Although Hamilton is not clear about the basis on which each of these incidents should have been excluded, we nevertheless analyze his claims. For ease of analysis, we address the incidents in two categories: those incidents occurring before Bryant began seeing Cowart and those occurring after she began seeing Cowart.

(a)   Starting with the more recent incidents, those taking place after Bryant began seeing Cowart, Hamilton argues generally that the evidence is not necessary to tell the story of the charged crimes and therefore is not intrinsic and that Bryant should not have been allowed to testify about the incidents because there was not sufficient evidence that the incidents occurred. We do not see any reversible error in the admission of this evidence.

First, Hamilton cannot claim any error in the admission of Bryant's testimony regarding the incident in which Hamilton followed Cowart after running into him at a convenience store. This incident appears to have been referenced in the State's amended notice, and the State asked Bryant about this incident outside of the

19

presence of the jury in the middle of her trial testimony. But she did not testify about this incident before the jury until the defense asked her about it on cross-examination.[8] Thus, Hamilton cannot challenge the admission of this particular testimony. See *Adkins v. State*, 301 Ga. 153, 156 (2017) ("A defendant generally cannot complain on appeal about the admission of evidence that he introduced himself, even when he does so after the trial court has overruled his objection to the admissibility of that evidence."). And, at any rate, this evidence was properly admitted as intrinsic for the reasons discussed below.

Regarding Bryant's testimony about Hamilton's various actions after she began seeing Cowart, "[e]vidence is intrinsic when it pertains to the chain of events explaining the context, motive, and set-up of the crime, and is admissible so long as it is linked in time and circumstances with the charged crime, forms an integral and

---

[8] In his primary brief to this Court, Hamilton suggests that Bryant testified about this incident to the jury on direct examination. But the portion of her direct testimony he cites for this proposition does not contain any reference of this incident.

natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *Hughes v. State*, 312 Ga. 149, 152 (2021) (cleaned up). Accord *United States v. Edouard*, 485 F3d 1324, 1344 (11th Cir. 2007). "There is no bright-line rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence." *Hughes*, 312 Ga. at 152 (quotation marks omitted). "We review a trial court's ruling admitting evidence as intrinsic for an abuse of discretion." Id. (quotation marks omitted).

Here, the evidence of Hamilton's actions after she began seeing Cowart showed Hamilton's anger over Bryant's relationship with Cowart. The evidence thus served to explain why Hamilton shot Bryant and Cowart, helping to refute the defense theory that some other perpetrator had committed the shooting.[9] The trial court

---

[9] Indeed, Hamilton attempted to show that he was not actually upset about Bryant's relationship with Cowart. In particular, on cross-examination of Bryant, Hamilton elicited Bryant's testimony that despite their tumultuous and violent relationship and Bryant's knowledge that she had been seeing

21

therefore did not abuse its discretion in concluding that the evidence at issue was reasonably necessary to complete the story for the jury and was therefore intrinsic. See *Hughes*, 312 Ga. at 152–53 (evidence that the defendant had vandalized a car of the murder victim's grandmother was properly admitted as intrinsic because it helped to show the tension between the defendant and members of the victim's family and why the defendant was not permitted in the victim's home and thus was followed out of the home by the victim before shooting the victim); *Clark v. State*, 306 Ga. 367, 373–75 (2019) (evidence that the defendant hit and pushed the murder victim's wife was properly admitted as intrinsic, as it provided context for the charged offenses by explaining why the family did not want the defendant in the home and why the victim followed the defendant outside of the home to make sure that he left); *Williams v. State*, 302 Ga. 474, 486–87 (2017) (evidence about the defendant's

Cowart for months, when Hamilton encountered Cowart at the convenience store there were "no words, … no argument, no fight, no, nobody shot anybody[.]" The acts at issue helped the State to dispute Hamilton's suggestion that he was accepting of Bryant's relationship with Cowart.

HIV status and prior sexual assault of non-fatal stabbing victim — the sister of the murder victim — was intrinsic because it helped explain why the sister refused the defendant's advances, the impetus for her declaration to the defendant that their relationship was over and they would never be alone again, and the increasing friction and conflict between the two that culminated in the crimes). See also *United States v. Weeks*, 716 F2d 830, 832 (11th Cir. 1983) (evidence that federal undercover agent was investigating stolen cars was intrinsic to charged crime of assault of a federal officer, as the investigation into stolen vehicles explained the agent's presence with the defendant and his associates and their animosity toward him).[10]

Hamilton argues that this evidence was not established by sufficient proof. But Bryant testified to these incidents at trial. And

---

[10] Our decision in *Harris v. State*, 321 Ga. 87 (2025), relied on by Hamilton, is different in that it involved evidence of domestic violence toward a previous partner, not the murder victim, admitted under Rule 404(b), purportedly to show absence of accident or mistake and that the defendant had a "motive to control intimate partners with violence." See id. at 95–101. Here, the evidence at issue involved actions by the defendant toward the victims of the charged crimes themselves and thus was necessary to complete the story of the crimes.

"[t]he testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-14-8. To the extent that Hamilton argues that Bryant's testimony about these events included improper speculation, particularly about his involvement in disabling her car, assuming such an argument was even preserved, "a lay witness may testify in the form of opinions which are '[r]ationally based on the perception of the witness[.]'" *Sims v. State*, 321 Ga. 627, 634 (2025) (quoting OCGA § 24-7-701(a)(1)). Particularly given Hamilton's experience as a mechanic, and given Bryant's testimony suggesting that Hamilton admitted to one of the incidents, we cannot say the trial court abused its discretion to the extent that it permitted Bryant to testify about her belief about Hamilton's responsibility for problems with her car. See *Sims*, 321 Ga. at 634–35 (witness's testimony that he believed the defendant was "taking up" for another was properly admitted given that it was rationally based on his observations).

"Of course, intrinsic evidence may be 'excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Hughes*, 312 Ga. at 153 (quoting Rule 403). "In reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (quotation marks omitted). As explained above, the evidence at issue was probative in explaining the context of the charged crimes and Hamilton's relationship with the victims, which helped the State make its case that Hamilton, and not another perpetrator, was the one who committed the shootings. The evidence in question might have had some unfair prejudicial effect, whether by suggesting to the jury that Hamilton had a propensity for violence or other abusive behavior or by inviting the jury to return a guilty verdict in this case to punish him for those previous uncharged acts. But whatever such effect it might have had was mitigated by the fact that Bryant was the State's primary witness both to the shootings and to the prior acts at issue. Hamilton's defense was that Bryant was not credible, and

25

so if the jury were skeptical that Hamilton committed the shootings, it likely would be skeptical of Bryant's testimony as to the prior acts, as well. Rule 403 was satisfied here. See, e.g., *Flowers v. State*, 307 Ga. 618, 622–23 (2020) (trial court did not abuse its discretion in deciding that the probative value of evidence of a prior beating of the victim by the defendant was not substantially outweighed by the danger of unfair prejudice, as the "evidence did not show merely that the appellant had engaged in a prior act of domestic violence, but, instead, it showed the nature of the relationship between the appellant and [the victim] and his motive in shooting her").

(b) Regarding the evidence of earlier actions by Bryant toward Hamilton before she started seeing Cowart, Hamilton makes similar arguments, as well as arguing that these incidents were too remote in time from the charged crimes to be admissible. We recognize that this evidence presents closer questions of admissibility either as intrinsic evidence or under Rule 404(b). But pretermitting whether the trial court abused its discretion in admitting this evidence, we easily conclude that any abuse of

discretion was harmless here.

"It is fundamental that harm as well as error must be shown for reversal." *Tarver v. State*, 319 Ga. 165, 169 (2024) (quotation marks omitted). See also OCGA § 24-1-103(a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kirby v. State*, 304 Ga. 472, 478 (2018) (quotation marks omitted). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." Id. (quotation marks omitted).

Here, to the extent that the evidence of acts by Hamilton prior to Bryant's involvement with Cowart would prejudice the jury by showing that Hamilton had previously acted abusively by acting violently toward Bryant, taking her belongings, and impeding her movements, this evidence is cumulative of the evidence that we already have determined was properly admitted as intrinsic — the

evidence of Hamilton's actions expressing his anger with Bryant's relationship with Cowart, which also involved Hamilton acting violently, interfering with Bryant's use of her belongings (i.e., her car), and impeding her movements.

Moreover, as noted above, given that the evidence at issue largely consisted of Bryant's own testimony, and Hamilton's defense turned on Bryant's credibility, it is unlikely that the jury's decisions as to guilt turned on Bryant's testimony about these prior incidents. Hamilton argues that the jury's notes to the court during deliberations showed that the error was harmful. But given that the case turned on Bryant's credibility about the identity of the shooter, it is highly probable that Bryant's additional testimony about the history of her relationship with Hamilton did not affect the verdict, especially given that it was cumulative of the intrinsic evidence of Hamilton's reaction to Bryant's relationship with Cowart. Thus, we conclude that any error in admission of the more temporally remote incidents was harmless. See *Kirby*, 304 Ga. at 487 (any prejudice from erroneous admission of defendant's prior armed robbery was

harmless in that jury was aware that he had committed other violent crimes and the evidence of guilt was compelling).

4. Finally, Hamilton argues that cumulative errors in his trial warrant reversal. We have assumed only one error, in the admission of a certain category of evidence, and determined that any such error did not prejudice Hamilton. There are no errors to consider together with this evidentiary ruling. Thus, this claim lacks merit. See *Flood v. State*, 311 Ga. 800, 808–09 (2021).

*Judgment affirmed. All the Justices concur, except LaGrua and Land, JJ., who concur specially in Division 3 (b).*

LAGRUA, Justice, concurring specially.

Because I believe that evidence of the prior incidents between Hamilton and Bryant—who was also a victim in this case—before Bryant started seeing Cowart was admissible to show motive under OCGA § 24-4-404(b) and was also admissible as prior difficulties and as intrinsic evidence, I specially concur in Division 3 (b) of this case. See *Lowe v. State,* 314 Ga. 788, 793 (2022) (concluding that evidence showing the appellant "violently lashed out at [the victim] when he was angry with her" would have been "relevant as a prior difficulty to show motive" because it "showed the tumultuous nature of their relationship"); *Payne v. State*, 313 Ga. 218, 222 (2022) ("Under OCGA § 24-4-404(b), evidence of a defendant's prior acts towards another person may be admissible into evidence when the defendant is accused of a criminal act against that person, where the nature of the relationship between the defendant and the victim sheds light on the defendant's motive in committing the offense charged." (quotation marks omitted)). See also *Heade v. State*, 312 Ga. 19, 25 (2021) (concluding that prior incidents involving the appellant were

admissible as intrinsic evidence because they were "part of the chain of events leading to the charged crimes" and were "reasonably necessary to complete the story for the jury," insofar as they explained the appellant's motivation and offered context to other witnesses' accounts of what occurred before the crimes at issue).

In this case, the evidence of prior difficulties between Hamilton and Bryant told the story of a tumultuous relationship rife with violence and jealousy that Hamilton exhibited towards Bryant, which ultimately led to the shootings of Bryant and Cowart and resulted in Cowart's death. The first incident the majority pretermits concerned an argument in 2016 during which Hamilton pinned a pregnant Bryant to the bed and hit her in the face with a bedrail. The next incident pretermitted by the majority concerned an argument in 2019 where Hamilton followed Bryant to a friend's house, blocked her from leaving in her car, and tried to forcefully remove her from the car. The final incident also occurred in 2019 when Hamilton hid Bryant's car keys after she attempted to break up with him.

There is nothing more intrinsic than the tumultuous and violent acts that occurred during Hamilton's relationship with Bryant to tell the story of his inability to leave Bryant alone and, when he ultimately discovered she was seeing someone else, to kill that person. This is the very definition of what it means to be intrinsic—something so inextricably intertwined that one piece cannot exist without the other. See *Felton v. State*, 920 SE2d 667, 677 (2025) (holding that "[e]vidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted" as intrinsic evidence "if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury").

For these reasons, I specially concur in Division 3 (b) but concur fully in the remainder of the opinion.

I am authorized to state that Justice Land joins in this special concurrence.